## In re CARTER.

### No. 475.

District Court, W. D. Virginia,
at Charlottesville.

July 20, 1944.

386

L. Grafton Tucker, of Lovingston, Va., for bankrupt.

Robert Whitehead, of Lovingston, Va., and J. L. Bitner, of Baltimore, Md., for Federal Land Bank of Baltimore and Federal Farm Mortgage Corporation.

PAUL, District Judge.

'Oder Patteson Carter, a farmer, on July 10, 1939, filed his petition under Section 75 of the Bankruptcy Act, 11 U.S.C.A. § 203, praying for an opportunity to effect a composition or extension of his indebtedness. No agreement was reached with his creditors and the debtor then filed his amended petition under subsection s of Section 75, praying to be adjudged a bankrupt and for the rights and privileges provided by subsection s. The usual proceedings followed. The farm property was appraised at $6,000, the rental value fixed and the usual three-year moratorium granted. The secured debts represented by two mortgage liens on the property amounted to approximately $12,000.

At the end of the three-year stay, the bankrupt petitioned to have the property reappraised. Sec. 75, sub. s(3), Bankruptcy Act. The conciliation commissioner appointed appraisers who, acting apparently on their own knowledge and examination of the property and without hearing evidence, appraised the land at $6,000, the same amount as the original appraisement. The secured creditors excepted to the report on the ground that the value fixed was inadequate and that they had had no opportunity to offer evidence of value. On a hearing of these exceptions the conciliation commissioner heard evidence from both sides on the question of value and entered an order confirming the report of the appraisers. Review of this order was sought by the creditors who did not attack the regularity of the proceeding before the conciliation commissioner, but complained that the appraised value was too low and that the commissioner failed to give weight to evidence tending to show a greater value. The district judge affirmed the order of the conciliation commissioner on the ground that the evidence of value was conflicting and the court was unable to say that the appraisal was plainly erroneous.

Thereafter the bankrupt paid into court the sum of $6,000 to be in full satisfaction of all claims against the property, and the secured creditors promptly filed their petition alleging that the appraisal was less than the real value of the land, that they would suffer great loss if the bankrupt were permitted to take the property at that sum and praying that a trustee be appointed to make a public sale of the property as provided by subsection s(3). The conciliation

commissioner denied the petition for a public sale and it is this order of denial, dated May 10, 1944, which now comes up for review.

The whole case rests in the interpretation of the meaning and purpose of paragraph (3) of subsection s of Section 75 of the Bankruptcy Act, and particularly to the meaning of the language in the second proviso of that paragraph. The conciliation commissioner filed no opinion, merely reciting in his order that the petition for a public sale was denied in accordance with the holding of the Supreme Court in the case of Wright v. Union Central Life Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L. Ed. 184. No suggestion is made that the creditors have failed in any way in the prosecution of their rights and it is clear that the conciliation commissioner denied the request for a public sale solely upon the belief that the statute gives the bankrupt an unconditional right to redeem the land at the appraised value; that such is his interpretation of the decision in the case cited by him.

I am unable to agree with the conciliation commissioner in the conclusion which he has reached. The purpose and meaning of subsection s of Section 75, and particularly of those provisions of it now in question, can best be determined by following its history from the beginning.

Section 75, dealing with agricultural compositions and extensions, was first enacted March 3, 1933, 47 Stat. 1470, in the form of an amendment to the Bankruptcy Act of 1898. As then enacted Section 75 ended with subsection r. By an act of June 28, 1934, 48 Stat. 1289, Section 75 was amended by adding thereto a new subsection s which dealt with the rights of a farmer debtor in case of his inability to effect the composition or extension which was the subject matter of Section 75. This amendment of June 28, 1934 (adding subsection s), was commonly referred to as the Frazier-Lemke amendment. The constitutionality of the provisions of subsection s came in question in various courts, first reaching the Supreme Court in the case of Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106, where it was held unconstitutional. Thereafter, on August 28, 1935, 49 Stat. 942–945, Congress enacted certain amendments to the then existing Section 75, including therein a revision of subsection s designed to meet the constitutional defects in its previous terms. This revision of subsection s is commonly referred to as the second Frazier-Lemke Act. This likewise was attacked on constitutional grounds but its constitutionality was upheld in the case of Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S. Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455. It is to these two cases, Louisville Joint Stock Land Bank v. Radford, supra, and Wright v. Vinton Branch, supra, in both of which the opinions were by Mr. Justice Brandeis, that we must look for light upon the question here presented.

The first Frazier-Lemke Act provided, as an initial step in the procedure, for an appraisal of the bankrupt's property and provided means whereby the bankrupt might, with the consent of lien holders, redeem the property by annual payments in varying amounts over a period of six years (paragraph 3 of the Act of June 28, 1934); but provided (paragraph 7) that if any secured creditor objected to this procedure, the court should stay all proceedings for a period of five years during which the debtor should retain possession of the property upon the payment of a reasonable rental therefor. The status of the property during this moratorium period was substantially the same as is provided in the later act by which the moratorium has been reduced to three years. The Act of June 28, 1934, further provided that at the expiration of the five-year period the debtor might redeem the property at the appraised value; with the provision that any lien holder might request a reappraisement and, if the lien holder so desired, require the redemption to be at the reappraised value. In any event the bankrupt might redeem at a value set either by the original appraisement or by the re-appraisement. There was no provision for a public sale nor any other means whereby the lien holder could protect his debt.

When the first Frazier-Lemke Act came under review in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 55 S. Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106, Mr. Justice Brandeis, in the opinion holding the law to be unconstitutional, chose to enumerate five specific property rights of which the lien holder had been deprived by its application (295 U.S. at page 594, 55 S.Ct. at page 865). As set out in the opinion, these rights of the creditor were:

"(1) The right to retain the lien until the indebtedness thereby secured is paid.

"(2) The right to realize upon the security by a judicial public sale.

"(3) The right to determine when such sale shall be held, subject only to the discretion of the court.

"(4) The right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself.

"(5) The right to control meanwhile the property during the period of default, subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt."

While the opinion does not indicate that the court attached to any one of these rights a greater importance than to the others, examination shows that all of them (or certainly the first four) are interrelated and have a common source; namely, the right of the creditor, under his mortgage contract, to have the property stand for his debt, with the consequent right either to receive payment of the debt in full or, in default thereof, to take the property in lieu of his debt. It is plain that had this right been preserved to the mortgagee in some adequate manner none of the deficiencies enumerated would have existed. The right in the lien holder to demand a public sale would have cured them all.

█ This right of the lien holder to have the property stand for the debt and, in case of default in the payment of the debt, to take the property in its stead is the very basis of all contracts whereby property is pledged as security for a loan. The creditor lends the money because of his belief that the property is worth at least the amount of the loan and because of his willingness to take the property in lieu of the debt in case the debt is not paid. This is the foundation, the essential element of every such contract. In its simplest and more primitive form it is exemplified by the case where a lender takes manual possession of personal property delivered to him as security for a loan with the understanding that if the debt is not repaid when due, the creditor may, without further formality, appropriate the pledged property to his own use. Except as modified by statute in some states this simple form of contract is that which exists in substance between a pawnbroker and his clients.

█ It is true that where real estate has been pledged as security for a debt we no longer permit that default in payment shall automatically transfer complete title to the creditor. As pointed out by Mr. Justice Brandeis (Louisville Joint Stock Land Bank v. Radford, 295 U.S. at page 578, 55 S.Ct. at page 858, 79 L.Ed. 1593, 97 A.L.R. 1106), this has been a gradual development of the law through the application of equitable principles which recognized the harshness of a rule that deprived a debtor of all interest in a property whose value might be far greater than the debt. The law came to recognize the equitable right of the debtor in any value of the property above the amount of the debt. Hence grew the right of the debtor to a period of redemption and, in case this was not exercised, to receive such part of the value of the property as was in excess of the debt. To the latter end a public sale of the property was required at which, through free and open bidding, the full value of the property might be realized and any amount remaining after payment of the debt might be returned to the debtor. But in any public sale of mortgaged property the creditor, for his protection, may bid at the sale and may apply the amount of his debt upon his bid. If some third party bids more than the amount of the debt secured, then the creditor will be paid in full from the proceeds of the sale. If the creditor is forced to buy in the property at the amount of his debt, or less, he has acquired the property in lieu of his debt. Thus, although the law may prescribe different procedures by which creditors may enforce their claims against different classes of pledged property, it has consistently maintained those rights of the lien holder which are the very essential of the contract, namely, the right to have the debt paid in full or to have the property stand in place of the debt. It was this right which the first Frazier-Lemke Act denied and a reading of the opinion in Louisville Joint Stock Land Bank v. Radford shows that it was in this denial that the court found the primary obstacle to the constitutionality of the law. Not only do the specific objections noted by the court (and hereinbefore quoted) center in this right, but the attitude of the court is clearly shown by the discussion preceding the enumeration of these specific rights (see 295 U.S. at pages 579 to 589, 55 S.Ct. at pages 858 to 863, 79 L.Ed. 1593, 97 A.L.R. 1106), as shown from the following excerpts:

At page 579 of 295 U.S., 55 S.Ct. at page 858, it is said:

"No instance has been found, except under the Frazier-Lemke Act * * *, of either a statute or decision compelling the mortgagee to relinquish the property to the mortgagor free of the lien unless the debt was paid in full.

"This right of the mortgagee to insist upon full payment before giving up his security has been deemed of the essence of a mortgage. His position in this respect was not changed when foreclosure by public sale superseded strict foreclosure or when the Legislatures of many states created a right of redemption at the sale price. To protect his right to full payment *or the mortgaged property,* the mortgagee was allowed to bid at the judicial sale on foreclosure." (Italics supplied)

And on pages 581, 582, of 295 U.S., 55 S. Ct. at page 859:

"None (of our national bankruptcy acts) had prior to the Frazier-Lemke amendment, sought to compel the holder of a mortgage to surrender to the bankrupt either the possession of the mortgaged property or the title, so long as any part of the debt thereby secured remained unpaid."

Again at page 584 of 295 U.S., 55 S.Ct. at page 860, after recognizing the right of a court of bankruptcy to order encumbered real estate to be sold free of liens, the court says:

"But there had been no suggestion that such a sale could be made to the prejudice of the lienor, in the interest of either the debtor or of other creditors. * * * And the sale is always made so as to obtain for the property the highest possible price. No court appears ever to have authorized a sale at a price less than that which the lien creditor offered to pay for the property in cash."

And at page 588, 589, of 295 U.S., 55 S. Ct. at page 863:

"It is true that the position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none; and that the Frazier-Lemke Act * * * is the first instance of an attempt, by a bankruptcy act, to abridge, solely in the interests of the mortgagor, a substantive right of the mortgagee in specific property held as security."

Following the discussion from which the above quotations are excerpts, the court, expressing the view that it was not necessary to consider the extent of the powers of Congress under the constitutional authorization to enact bankruptcy laws, pointed out that any such power was in any event subject to the prohibition of the Fifth Amendment against the taking of property without just compensation; and that this constitutional provision was violated by the statute.

Following the decision in Louisville Joint Stock Land Bank v. Radford, Congress enacted what is known as the second Frazier-Lemke Act, approved August 28, 1935, 49 Stat. 942, by the terms of which it undertook to cure the deficiencies of the first act. This second act amended Section 75 in several particulars, but it is only with the amendment of subsection s, which was elaborately revised, that we are here concerned. It is clear that these amendments were designed to preserve to the lien creditors their right to enforce payment of their debts from the property on which the lien rested. A significant change evidencing this intention was made by paragraph (1) of the amended subsection s where it was provided that the possession of the property by the debtor during the moratorium period (which was reduced to three years) should be subject to all existing liens; that such liens should remain in full force and effect and that "the *property covered by* such mortgages, liens * * * or encumbrances shall be subject to the payment of the claims of the secured creditors * * *." (Emphasis supplied) The provision of the first Frazier-Lemke Act had been (paragraph 2) that the property should be subject to the existing liens "up to the actual value of such property *as fixed by the appraisal * * *.*" (Emphasis supplied)

However, it is in those provisions of the statute dealing with the rights of the parties at the expiration of the moratorium period, that the most specific changes were made by the amended statute. In the original act (paragraph 7), as hereinbefore pointed out, the debtor had been given the right to redeem or purchase the property by paying the amount at which it had been originally appraised or at which it had been reappraised. In the amended act the procedure at the expiration of the moratorium is dealt with in paragraph (3) which is as follows:

"At the end of three years, or prior thereto, the debtor may pay into court the

amount of the appraisal of the property of which he retains possession, including the amount of encumbrances on his exemptions, up to the amount of the appraisal, less the amount paid on principal: *Provided,* That upon request of any secured or unsecured creditor, or upon request of the debtor, the court shall cause a reappraisal of the debtor's property, or in its discretion set a date for hearing, and after such hearing, fix the value of the property, in accordance with the evidence submitted, and the debtor shall then pay the value so arrived at into court, less payments made on the principal, for distribution to all secured and unsecured creditors, as their interests may appear, and thereupon the court shall, by an order, turn over full possession and title of said property, free and clear of encumbrances to the debtor: *Provided,* That upon request in writing by any secured creditor or creditors, the court shall order the propety upon which such secured creditors have a lien to be sold at public auction. The debtor shall have ninety days to redeem any property sold at such sale, by paying the amount for which any such property was sold, together with 5 per centum per annum interest, into court, and he may apply for his discharge, as provided for by this Act. If, however, the debtor at any time fails to comply with the provisions of this section, or with any orders of the court made pursuant to this section, or is unable to refinance himself within three years, the court may order the appointment of a trustee, and order the property sold or otherwise disposed of as provided for in this Act."

■ There would seem no room for serious doubt as to the meaning and effect of the above quoted paragraph. And this is particularly true when it is considered in the light of the decision in Louisville Joint Stock Land Bank v. Radford. It was plainly intended to preserve the right of the lien holder under his mortgage contract to have his debt paid in full or to compel a public sale at which, if he chose to do so, he might become the purchaser of the property and thereby acquire it in lieu of the debt. The effort was to remedy the situation which had led to the holding of unconstitutionality of the former act.

The statute as amended plainly contemplates the following procedure: at the expiration of the moratorium period the debtor may pay into court the amount at which the property was originally appraised subject to the condition that if either the debt-or or a secured creditor requests a re-appraisement, then the debtor shall make payment of the re-appraised value. The payment into court, at whichever amount determined, is for the purpose of redemption of the property. But the right to redeem upon making this payment is subject to the condition that, if the creditor shall so demand, the property shall be sold at public auction, with the right in the debtor, within ninety days after the public sale, to redeem at the price at which the property was sold. It amounts to an offer of the debtor to redeem at the appraised (or reappraised) value; an offer which the law requires be accepted unless the creditor objects in the manner provided by the statute, namely, by requesting a public sale; following which the debtor's right to redeem must be at the sale price.

The reason for these conditions seems obvious and logical. When the debtor offers to redeem at the appraised value, the creditor may believe that this represents the full value of the property or it may be such as to insure full payment of the debt; in either of which events the creditor loses nothing by acquiescing in the redemption. On the other hand, the creditor may feel that the real value of the property is decidedly greater than the appraisement and be himself willing to pay this greater value rather than to lose part of his debt. In this situation he has a right to ask for a public sale. The rights of the creditor under the mortgage contract are fully protected by this option of acquiescing in the redemption at the appraised value or of having a public sale.

This is undoubtedly the construction adopted when this, the second Frazier-Lemke Act, was before the Supreme Court in the case of Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 57 S. Ct. 556, 81 L.Ed. 736, 112 A.L.R. 1455, where its constitutionality was upheld in an opinion also written by Mr. Justice Brandeis. Much of that opinion, together with the marginal notes thereto, involves discussion of the right of the creditor to a public sale. It is clear that the court was in no doubt that the amended statute gave this right and it is equally clear, I think, that the act was upheld because the court considered that the granting of this right dissolved the constitutional objections to the original statute. There is no need to refer here to all those portions of the opinion which support this interpretation, but some

of the language may well be quoted. At pages 457-459 of 300 U.S., 57 S.Ct. at page 559, it is said:

"In drafting the new Frazier-Lemke Act, its framers sought to preserve to the mortgagee all of these rights so far as essential to the enjoyment of his security. The measure received careful consideration before the committees of the House and Senate. Amendments were made there with a view to ensuring the constitutionality of the legislation recommended. The congress concluded, after full discussion, that the bill, as enacted, was free from the objectionable features which had been held fatal to the original Act.

"Third. It is not denied that the new Act adequately preserves three of the five above enumerated rights of a mortgagee. 'The right to retain the lien until the indebtedness thereby secured is paid' is specifically covered by the provisions in paragraph 1, that the debtor's possession 'under the supervision and control of the court,' shall be 'subject to all existing mortgages, liens, pledges, or encumbrances,' and that:

" 'All such existing mortgages, liens, pledges, or encumbrances shall remain in full force and effect, and the property covered by such mortgages, liens, pledges, or encumbrances shall be subject to the payment of the claims of the secured creditors, as their interests may appear.'

" 'The right to realize upon the security by a judicial public sale' is covered by the provision in paragraph 3 that at the termination of the stay: ' * * * upon request in writing by any secured creditor or creditors, the court shall order the property upon which such secured creditors have a lien to be sold at public auction.'

"The new Act does not in terms provide for 'The right to protect its (the mortgagee's) interest in the property by bidding at such sale whenever held.' But the committee reports and the explanations given in Congress make it plain that the mortgagee was intended to have this right. We accept this view of the statute."

Mr. Justice Brandeis' opinion, largely in the notes thereto, cites and quotes copiously from the proceedings in Congress attending the enactment of this statute, which clearly show the intent of that body that the right to a public sale should be secured to the creditors. I quote only one of these (note, 300 U.S. at page 459, 57 S.Ct. at page 560):

"The bill as reported by the Senate Committee on the Judiciary inserted after the provision for appraisal a clause providing, 'That upon request in writing by any secured creditor or creditors, the court, in its discretion, if it deems it for the best interests of the secured creditors and debtor, may order the property upon which such secured creditors have a lien, to be sold at public auction; * * *' S. 3002, as reported, § 6, p. 9; see Sen.Rep. No. 985, 74th Cong., 1st Sess., p. 4. 'To remove a question as to the constitutionality of the bill,' this provision was altered in the course of the bill's passage through the House to deprive the court of discretion in the matter and to give the secured creditor an unqualified right to a public sale as the alternative to a transfer of the property to the debtor at the re-appraised value."

It might here be noted that the interpretation that the statute grants the creditor an unqualified right to a public sale was concurred in by the debtor in Wright v. Vinton Branch and in fact advanced by him in argument as a reason for upholding the constitutionality of the act. See 300 U.S. at page 445, 57 S.Ct. 556. Among the counsel asserting this viewpoint was one of the authors of the statute.

For better understanding of the statute it should be pointed out that the provision as to a public sale at the request of the creditor is a limitation or condition attached to the right of the debtor to redeem at the appraised value. The right of the creditor in this respect is by the terms of the statute limited to the time when the debtor seeks to redeem. Some confusion has arisen from the last sentence of paragraph (3) and the effort to construe it as a part of the proviso by which the creditor's right to request a public sale is given. The conditions set forth in the last sentence are no part of those relating to the debtor's right to redeem or the creditor's right to a public sale as set forth immediately preceding. The last sentence deals with a different matter, i.e., the right of the court in its discretion to terminate the proceedings at any time, when the debtor fails to comply with the provisions of the statute or when it becomes apparent that the debtor is unable to refinance himself within three years. Mr. Justice Brandeis in his opinion in Wright v. Vinton Branch points out that this last sentence of paragraph (3) is not a part of the second proviso of the paragraph

whereby the creditor has a right to demand a public sale of the encumbered property. See note 300 U.S. at page 466, 57 S.Ct. at pages 563, 564. He considered it as dealing with a different matter; that it was a limitation upon the right of the mortgagor to retain possession of the property for the full period of three years and that it was designed to meet the constitutional objection which might have existed had the debtor been given absolute and unconditional possession for the moratorium period. See 300 U.S. at pages 461, 462, 57 S.Ct. at pages 561, 562. And see discussion interpreting this section in Federal Land Bank v. Nalder, 10 Cir., 116 F.2d 1004, 1006.

In the instant case no sale is proposed because of any delinquency on the part of the debtor or for any of the reasons set forth in the last sentence of paragraph (3) and so far as this case is concerned the statute may be read without this sentence. So treated any uncertainty as to the intent of the statute is dissipated and it seems clear that whenever, at the expiration of the three-year stay or before, the debtor offers to redeem at the appraised value the creditor may require a public sale as an alternative thereto. There can be no doubt that this was the effect of the holding in Wright v. Vinton Branch. This was the interpretation placed on the statute by a number of the lower courts prior to the Supreme Court decision in Wright v. Vinton Branch. See In re Diller, D.C., 13 F.Supp. 249, 251; In re Schoenleber, D.C., 13 F.Supp. 375, 379; In re Young, D.C., 12 F.Supp. 30, 32. It is also the interpretation held following that decision; Lowman v. Federal Land Bank, 7 Cir., 107 F.2d 540; In re Moon, 7 Cir., 107 F.2d 545; In re Monjon, 7 Cir., 113 F.2d 535.

Indeed, this interpretation of the statute seems to have been universally accepted until the. decision in Wright v. Union Central Ins. Co., 311 U.S. 273, 61 S.Ct. 196, 85 L. Ed. 184, which the debtor in this case cites in support of his contention. It remains to be seen therefore whether Wright v. Union Central does in fact hold that a debtor has an absolute right to redeem at the appraised value, as the debtor here contends, and as the conciliation commissioner held.

I am unable to give to Wright v. Union Central Ins. Co. any such effect. In the first place, the specific question here involved was not present in that case and if it had any such effect it could be merely by implication. To imply decision of questions not directly before a court is an uncertain business. In Wright v. Union Central the creditor petitioned the court to order a sale of the property, prior to the expiration of the three-year stay, on the grounds that the debtor had failed to obey the orders of the court and that he had no chance of rehabilitation. The debtor countered with a petition that the property be appraised and that he be allowed to redeem it at that value. The trial court, after a hearing, found that the debtor had been delinquent in the respects alleged and that there was no reasonable prospect of his rehabilitation. Upon this finding the court ordered the land to be sold at public auction. This action was affirmed by the Circuit Court of Appeals, 7 Cir., 108 F.2d 361. It is clear that the lower courts were acting on the basis of the last sentence of Sec. 75, sub. s (3) where a sale may be ordered at any time when the conditions there named obtain. The Supreme Court held, however, that even under these conditions the debtor should be given an opportunity to redeem the property at a value fixed by the court before ordering a public sale. The effect of this, I take it, was to grant to a debtor in default under the last sentence of paragraph (3) the same rights as accorded him on the orderly expiration of the three-year stay. What those rights are, as well as the rights of the creditor at such time have already been discussed.

It is true that certain language used in the opinion in Wright v. Union Central gives support to the contention made by the debtor here that there is an absolute right in the debtor to redeem at the appraised value and that the right of the creditor to have a public sale arises only when the debtor fails to exercise his right; but this result can be accepted only by considering that language apart from the full context of the opinion and in disregard of the particular question involved in that case.

To accept the debtor's contention would be to restore to the statute a provision of the very nature which rendered the first Frazier-Lemke Act unconstitutional. It would also be to deny the existence in the creditor of the very right which Mr. Justice Brandeis, in Wright v. Vinton Branch, declared to exist and upon the existence of which the constitutionality of the present statute was upheld. Wright v. Union Central does not purport to overrule Wright v. Vinton Branch or to criticise the reasoning or the foundation of the opinion in that

case. There is no suggestion that it was decided on a mistaken construction of the statute. Until there is a more definite expression to that effect I am unwilling to assume that the Supreme Court intended to depart from the views expressed in Wright v. Vinton Branch, which clearly asserted the existence of the right which the creditors in the instant case are claiming.

I have been unable to find any case in which this exact point has been passed on since the date (December 9, 1940) of the decision in Wright v. Union Central. But some significance is attached to the course of certain cases arising in the Seventh Circuit where this statute has been the subject of much litigation. In the case of In re Lowman, 7 Cir., 107 F.2d 540, 543, 544, the specific question was involved and the court took the view, and so held, that under the decision in Wright v. Vinton Branch the debtor's right to redeem at the appraised value was not absolute but was subject to the right of the creditor to require a public sale of the land. This is our specific question. The same question was passed on similarly by the same court in the case of In re Moon, 7 Cir., 107 F.2d 545, 546. Later the same court in In re Monjon, 7 Cir., 113 F.2d 535, 538, again had the precise question before it and adhered to and cited its decisions in the Lowman and Moon cases.

In the Lowman case certiorari was denied, 309 U.S. 680, 60 S.Ct. 724, 84 L.Ed. 1024; and on repeated petitions for rehearing, 310 U.S. 616, 60 S.Ct. 1093, 84 L.Ed. 1391, and 310 U.S. 656, 60 S.Ct. 896, 84 L.Ed. 1420, was again refused, 311 U.S. 724, 61 S.Ct. 54, 85 L.Ed. 472. The Moon case followed the same course, certiorari being denied, 310 U.S. 624, 60 S.Ct. 897, 84 L.Ed. 1395, and rehearings denied, 310 U.S. 658, 60 S.Ct. 1085, 84 L.Ed. 1421, and 311 U.S. 723, 61 S.Ct. 54, 85 L.Ed. 471. Final denial in both cases was on October 14, 1940.

In Wright v. Union Central Ins. Co. certiorari was granted May 20, 1940, 310 U.S. 618, 60 S.Ct. 1078, 84 L.Ed. 1392, and the case was argued November 20, 1940. It will be seen, therefore, that at the time this latter case was on the docket of the Supreme Court, and had been for some months, certiorari was refused in the Lowman and Moon cases. Under these circumstances, it must be assumed that the court conceived that decision of the question raised in Wright v. Union Central which it had consented to review would not be ap-

plicable to or affect the specific question in the Lowman and Moon cases. It would be unreasonable to assume that the court would have refused certiorari in the latter cases, thereby allowing the judgments of the lower court to stand, if it had considered that the questions in those cases were related to and might be affected by its decision in another case then pending before it. It would be even more unreasonable to assume that the court intended to make a ruling in Wright v. Union Central upon a question not involved in the case, where it had, at the same term of court, given approval (by refusal of certiorari) to a contrary holding in two cases where the specific question was involved. In the Lowman and Moon cases the specific question now involved was in controversy and the court refused to disturb rulings contrary to that urged by the debtor here. It would be going far to assume that a reversal of this holding was intended merely by implication in another case in which the particular question was not presented. For these reasons, as also from the full context of the opinion in Wright v. Union Central, I cannot ascribe to that case the effect which the debtor urges for it and which the conciliation commissioner has given it.

Finally, as an argument against the right to a public sale, it is insisted that in any event "all the secured creditor is entitled to receive is the value of the property as determined and fixed by the court". This, I presume, means the appraised value as finally arrived at.

There are, I think, several answers to this contention: First, it is contrary to the terms of the mortgage contract. Second, it is contrary to the plain intent of Congress. And even more it is contrary to the foundation principles on which are based all contracts relating to pledges of property as security for debts and the law as to their enforcement. This underlying principle is, as already pointed out, the right of the creditor to acquire or have the opportunity to acquire the property in lieu of his debt in case the debt is not paid. The creditor lends the money on the strength of the property and the amount he is willing to lend is determined by his estimate of what the property is worth to him; the valuation at which, in case the debt is not paid, he would be willing to take the property. To one prospective lender this value might be greater than to another and the

former might make a larger loan than the latter. Some lender might make a loan on the property which other persons, equally well informed, considered excessive and more than the property was worth; but which represented to the person making the loan the value to him and was the amount for which *he* was willing to take the property over in case the debt was not paid. No one can tell what considerations enter into the estimate of value which a creditor places upon property on which he lends money. These, as well as the estimates of value arrived at, may and frequently do differ among different persons. But always to the person making the loan the value is that for which he (not someone else) is willing to have the property stand and at which *he* would be willing to take the property in lieu of his debt. His right is to have the property stand for his debt—a debt the amount of which was determined by the valuation which he placed on the property and for which he was willing to have it stand. This is the very essential of the contract and it would be completely destroyed if the creditor was compelled not only to forego collection of his debt in full but to accept whatever lesser sum might be fixed by third parties having no interest in fulfillment of the contract as representing their estimate of the value of the property; and although the creditor himself, both in making the loan and in seeking to collect it, might be willing to acquire it for the full amount of his debt.

No farmer could obtain credit if the creditor had such a prospect before him. This aspect of the situation was widely debated in Congress at the time the first Frazier-Lemke Act was passed. That act *as drafted* applied equally to then existing and to future debts. Before passage it was amended to apply specifically only to debts existing at the time of passage. The purpose of the amendment, expressly stated in debate, was because it was believed that if made applicable to future contracts it would destroy any chance of a farmer obtaining credit; that no one would grant a loan on such a prospect. See citations of Congressional debates in notes to Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 595, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106. In the enactment of the second Frazier-Lemke Act it was specifically made applicable to future as well as to existing cases. See subsection s, a paragraph (5), 49 Stat. 945. And there is no question that in making it applicable to future cases

Congress believed and intended that there should be no impairment of agricultural credit through a possibility that the creditor would, against his will, be compelled to accept less than the amount of his loan. The right of the creditor to demand a public sale was the assurance to him that his lien would be protected.

The order of the conciliation commissioner denying the creditors' petition for a public sale will have to be reversed.