In re George T. ROSS, Debtor.

The **RIGGS NATIONAL BANK OF WASHINGTON, D.C.,** Plaintiff,

v.

**George T. ROSS,** Defendant.

Bankruptcy No. 92–34475–S.
Adv. No. 92–3194–S.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Aug. 30, 1994.

Peter W. Runkle, Obenshain, Hinnant & Runkle, Richmond, VA, for debtor/defendant.

S. Miles Dumville, Hazel & Thomas, P.C., Richmond, VA, for plaintiff.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY,
Bankruptcy Judge.

This matter comes before the Court on The Riggs National Bank of Washington, Incorporated's ("Riggs") complaint to determine the dischargeability of a debt allegedly owed to it by George T. Ross ("Ross"). Upon consideration of the memoranda submitted, arguments of counsel, and evidence presented at the May 6, 1994 trial and the parties' proposed findings of fact and conclusions of law filed by July 5, 1994, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

Ross was a general partner of Plaza One Associates ("Plaza"), a Virginia Limited Partnership whose primary business was the purchase and development of commercial real estate in the Richmond, Virginia metropolitan area. Plaza was building the Richmond Airport Hilton–Hotel ("The Hotel") which was financed using bonds issued by the Industrial Development Authority of Henrico, Virginia ("The IDA"). These bonds were secured by a deed of trust on the hotel. These bonds were also secured by a Letter of Credit ("The LoC") issued by Riggs on October 22, 1986. As part of the underlying security for the LoC, Riggs requested and obtained Ross's personal guarantee. The structure of the IDA's loan agreement mandated that Plaza make payments on the bonds to the IDA. Should these payments not be forthcoming, Riggs's LoC would then be tapped and the payments would be made from these LoC draws. Plaza would then make payment to Riggs to reimburse the bank for the LoC draws. If Plaza did not make these payments to Riggs, Riggs, pursuant to the guaranty, could then make demand on Ross to satisfy the debt created by the LoC draws.

On March 29, 1990, the IDA, through its agent, made a $135,250.69 draw on the LoC. Plaza did not repay Riggs for this draw. A year before, Plaza had also neglected to pay the Letter of Credit fee owed on October 22, 1989. As a result of these delinquencies, Riggs brought suit against Ross on his guaranty in the United States District Court for the Eastern District of Virginia. In its July 23, 1990 decision in *The Riggs National Bank of Washington v. George T. Ross, et al.*, the District Court found that Ross was liable to Riggs in the amount of $212,969.44 plus interest pursuant to the guaranty agreement. On January 8, 1991, the District Court also ordered Ross to pay Riggs $34,-250.67 in attorney fees and expenses. After the first LoC draw on March 29, 1990, the IDA made additional draws eventually utilizing the entire LoC, causing an indebtedness of approximately $7,771,875.00. No payments have ever been made to Riggs on the LoC by either Plaza or Ross.

Riggs argues that the debt owed to it by Ross by virtue of his guaranty is nondischargeable because in issuing the LoC, Riggs relied upon certain misrepresentations contained in Ross's 1985 Personal Financial Statement ("The 1985 Statement") and an April 21, 1986 letter written, at Ross's direction, by Daniel A. Gecker to Riggs ("The Gecker Letter"), Ross's attorney and another general partner in Plaza. The Gecker letter was created in order to update the 1985 statement. Riggs points to both documents and argues that they fail to contain information about certain significant obligations of Ross, chief among them an October 1983 guaranty granted by Ross to Manufacturers Hanover Trust Company ("Manufacturers Hanover"). This obligation was incurred by Ross in relation to another project he was involved in, the restoration of the Jefferson Hotel ("The Jefferson Project").

In his April 1986 letter, Gecker reported that there had been some changes since the 1985 statement had been generated. In addition to some appreciation in assets and the sale of others, Gecker stated that the Manufacturer Hanover debt was presently at $250,000.00 but was expected to be paid off.[1]

---

1. The letter in relevant part states:

As we discussed today, I am pleased to pro-

However, it appears that approximately one month prior to the Gecker letter, in March 1986, Ross and others guaranteed even more debt to finance the Jefferson project. Before taking on this new debt, the Jefferson project had been lent $2,250,000.00. With the new loans, again guaranteed by Ross, the Jefferson project took on an additional $4,835,000.00 in debt, bringing the total Manufacturers Hanover debt guaranteed by Ross as of mid-March 1986 to over $7,000,000.00. The $4,835,000.00 disbursement was authorized by Ross and his two partners in a signed letter dated March 6, 1986.

Despite being contingently indebted on his Manufacturers Hanover guaranty for over $7,000,000.00 by March 1986, Ross did not direct Gecker to inform Riggs of this material change in Ross's financial status. Gecker, in his April 21, 1986 letter, states that the indebtedness to Manufacturers Hanover Trust Co. was $175,000 but in an asterisk states that this figure does not reflect the $250,000.00 associated with the Jefferson project. Ross did submit another financial statement dated May 1986 to Riggs on December 9, 1986. However, this was after Riggs's decision to issue the LoC and is therefore irrelevant to the Court's analysis.[2]

Among his responses to Riggs's allegations, Ross has stated that none of the financial statements mentioned above were signed by George Ross personally, that there is no evidence that Ross even saw the documents before they were transmitted, and that Ross defended the statements "in his depositions as being materially correct at the time they were issued and in accordance with his understanding of his financial situation." *Findings of Fact and Conclusions of Law Proposed by George T. Ross*, p. 6 (filed June 23, 1994). The omission of the correct amount of Manufacturer Hanover guaranty liability on the June 1985 statement is dismissed by Ross who states that this was a contingent liability and the June 1985 statement did not discuss contingent liabilities.

Ross also states that by allowing its wholly-owned subsidiary, RBV, Inc. ("RBV")— the "alter ego" of Riggs, to purchase Plaza's property at foreclose for $10,000.00 subject to Plaza's outstanding debt to Riggs[3], Riggs in effect fully discharged Ross's guarantor debt by paying off the underlying indebtedness.[4] Riggs answers that, first, this affirmative defense of payment and discharge is waived since Ross did not raise it in his answer. Next, Riggs points out that RBV, not Riggs, was the purchaser at the sale and that Ross ignores the separate corporate identities of these entities in his answer.

In its prayer, Riggs asks this Court to deny Ross's motion to strike, enter judgment in favor of Riggs against Ross for $8,068,684.86 plus interest at a rate equal to Riggs' prime rate plus two percent, determine that this judgment and the U.S. District Court judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(B) and award Riggs $360.50 in attorneys' fees.

## Conclusions of Law

The Court first addresses whether or not Ross's guarantor liability has been wiped out by RBV's purchase of Plaza's property.

---

*Plaintiff's Exhibit,* # 7 (Introduced at trial).

vide you with an update on George Ross' financial position. I believe that the last financial statement done was June 30, 1985, so I will work from that compilation.

Under the category of investments, there have been a few significant changes.... There has been an overall decrease in the amount of direct and contingent liabilities of George associated with the project [another hotel project that Ross was involved in]. The direct liability is now $250,000 owing to Manufacturers Hanover Trust Company and the contingent liability is $600,000 to Key Bank (New York), joint and several with Richard Siegel and Frank Weber. On the plus side, at final closing (expected to be mid-May), George is entitled to a fee of $250,000. This fee will be used to curtail the liability to Manufacturers Hanover Trust Company.

2.  *See In re Jacobe,* 121 B.R. 299 (Bankr.E.D.Va. 1990).

3.  During the trial, Robert Rial, an Riggs officer, testified as to the structure of RBV's purchase of the property:

    [T]he entity that bought the property took it subject to the existing trust of 7.7 million and paid $10,000 for that, which was also credited. *Trial Transcript,* p. 37 11.22–25.

4.  It should be noted that RBV appears to have eventually sold the property to a third party for $4.7 million cash and a $3.7 million loan.

*Failure to Plead Affirmative Defense*

In his answer to Riggs's complaint, Ross did not plead the affirmative defense that the debt he is seeking to be held liable on has been paid off. Instead, he argued this defense at trial and in his post-trial brief. Federal Rule of Civil Procedure 8(c), incorporated into the Code through Bankruptcy Rule 7008, provides a non-exhaustive list of affirmative defenses and states in pertinent part: "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ... payment, release ... and any other matter constituting an avoidance or affirmative defense." The failure to formally plead an affirmative defense usually results in that defense being waived. *See In re J.B. Lovell Corp.,* 88 B.R. 459, 462 (Bankr.N.D.Ga.1988) and *In re O'Brien,* 110 B.R. 27, 30 (Bankr. D.C.Colo.1990). Furthermore, affirmative defenses are not raised by the assertion of a general denial. *Lovell,* 88 B.R. at 463. However, certain exceptions to this general rule have been noted in case law. Judge Markovitz in *In re Glenn,* 108 B.R. 70 (Bankr.W.D.Pa.1989) stated:

> The reason for this rule [that an affirmative defense that has not been pleaded is deemed waived] is to put plaintiff on notice, *well in advance of trial,* that a defendant intends to pursue a defense that is in the nature of avoidance.
>
> This rule is not iron-clad, however. Failure to plead an affirmative defense need not result in its waiver when the policy behind the rule is not violated. For instance, if the matter is raised in the trial court in a manner which does not result in unfair surprise or prejudice, technical failure to comply with FED.R.CIV.P. 8(c) need not be fatal.

*Id.* at 73 (citations omitted) (emphasis original) (The Court therein denied defendants assertion that the creditor's action was barred by the statute of limitations because the matter was raised moments before the trial was scheduled to begin). While it appears that this issue was raised in the trial rather than moments before the trial, Riggs was allowed an opportunity to address the issue of repayment in its proposed findings of fact and conclusions of law and its response to Ross's proposed findings of fact and conclusions of law. The Court believes these post-trial briefs allowed Riggs to adequately state its case and therefore eliminated the unfair surprise and prejudice, that FED. R.CIV.P. 8(c) was designed to prevent.

Adding more support to the Court's thinking on this subject is *M.H. Gordon & Son, Inc. v. Debtor & Committee of Unsecured Creditors,* 62 B.R. 552 (D.Mass.1986) which stated that a Bankruptcy Court could *sua sponte* raise the issue of equitable subordination, an affirmative defense, even though the defendant had failed to do so. The court stated:

> The bankruptcy court has long been known as a court of equity which exercises its equitable powers to ensure that substance does not give way to form and technical considerations do not prevent substantial justice from being done. *Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). Indeed, a bankruptcy court has the duty, as well as the power, to examine the circumstances surrounding a claim to see that injustice and unfairness are not done when allowance of the claim will accrue to the benefit of a controlling stockholder with fiduciary obligations to a corporation. *Id.* at 307–08, 60 S.Ct. [at] 246. To fulfill this mandate, a bankruptcy court itself may have to raise the issue of equitable subordination if a party in interest has failed to do so.

*Id.* at 554. The Court believes that justice requires that it raise the issue of whether or not Ross's debt was satisfied when Riggs's wholly-owned subsidiary bought Plaza's property. To not do so may allow a creditor to recover twice for the same debt.

*Effect of RBV's Purchase of the Plaza Property on Ross's Liability*

The debtor alleges that since Riggs's wholly-owned subsidiary, RBV purchased the property for $10,000.00 cash subject to the outstanding debt on the property, Plaza's debt was wiped out and along with it, Ross's guarantor liability. He cites to *In re Carter,* 56 F.Supp. 385 (W.D.Va.1944) which stated:

But in any public sale of mortgaged property the creditor, for his protection, may bid at the sale and may apply the amount of his debt upon his bid. If some third party bids more than the amount of the debt secured, the creditor will be paid in full from the proceeds of the sale. If the creditor is forced to buy in the property at the amount of his debt, or less, he has acquired the property in lieu of his debt. *Id.* at 388. If this Court were to adopt the *Carter* rationale, then Ross would owe nothing on his guaranty because Plaza's indebtedness to Riggs would be extinguished when RBV, a wholly-owned subsidiary of Riggs, bought the property for $10,000.00 plus the outstanding debt. However, while *Carter* may have been an accurate statement of the law in 1944, the Court believes later cases have produced a different end result.

In *Resolution Trust Corp. v. Maplewood Invs.*, 31 F.3d 1276 (4th Cir.1994), the Fourth Circuit described similar facts as found in the instant case. There, a creditor had lent money in order to allow Maplewood to purchase some land. In exchange for the loan, the creditor took a deed of trust in the property and also obtained guaranties from certain individuals. Maplewood eventually defaulted on the loan and the creditor purchased the property at the foreclosure sale for approximately 70% of the outstanding loan balance or $277,300.00. The creditor then went against Maplewood and the individual guarantors for the 30% deficiency. It should be noted that the case itself dealt with other issues concerning, among other things, the adequacy of the foreclosure sale. However, the Fourth Circuit recited the facts of the foreclosure purchase by the bank in the first part of the opinion and made no comments as to illegality of the creditor going after the debtor and guaranty for the deficiency.

Here, the only cash used by RBV to purchase the property was the $10,000.00. In addition, *Carter* is flawed for the Court's purposes because it is factually different in one important area: in *Carter* it appears that the bank itself purchased the property at foreclosure; in the instant case the bank's wholly-owned subsidiary made the purchase and later sold the property. Thus, *Carter* proves of little help to the Court in deciding whether RBV's purchase had any effect on Ross's outstanding indebtedness to Riggs. If there is outstanding indebtedness, the Guaranty Agreement signed by Ross states that he will be liable on the LoC debt until all of that obligation owed to Riggs is paid in full.[5]

While this Court makes no ruling on the applicability of *Carter* to this case, it is puz-

---

5. The Guaranty Agreement states in pertinent part:

2. This Guaranty shall be a continuing, absolute and unconditional guaranty and shall remain in full force and effect until all of the Obligations shall have been paid or provided for in full, at which time this Guaranty shall terminate and be of no further force and effect.

. . . .

4. The obligations of the Guarantors hereunder shall be absolute and unconditional and shall not be impaired, modified, released or limited by any occurrence or condition whatsoever, including without limitation ... (b) any impairment, modification, release or limitation of the liability of the Purchaser, or any other security for or guaranty of the Bonds, or any remedy for the enforcement thereof, resulting from the operation of any present or future provisions of the Federal laws or other statute or from the decision of any court relating thereto,

. . . .

6. No act of commission or omission of any kind or at any time upon the part of the Trust-ee or the Letter of Credit Bank in respect of any matter whatsoever shall in any way affect or impair the rights of ... the Letter of Credit Bank to enforce any right, power or benefit of ... the Letter of Credit Bank under this Guaranty, and no set-off, claim, reduction or diminution of any obligation or any defense of any kind or nature which the Guarantors have or may have against ... the Letter of Credit Bank, their successors or assigns to enforce any right, power, or benefit under this Guaranty. Nothing in this Guaranty shall be construed as a waiver by the Guarantors of any rights or claims they may have against the ... Letter of Credit Bank ... under this Guaranty or otherwise, but any recovery upon such rights and claims shall be had from the ... Letter of Credit Bank separately, it being the intent of this Guaranty that the Guarantors shall be unconditionally and absolutely obligated to perform fully all of their obligations, agreements and covenants hereunder for the benefit of the Letter of Credit Bank and the holders of the Bonds.
*Guaranty Agreement*, pp. 2–3 (Joint Stipulation Exhibit # 21).

zled as to how much Ross actually owes Riggs. The Court is uncertain as to whether the Riggs–RBV transaction left any deficiency on Plaza's loan. Riggs's witness, Robert Rial, testified that the sale was subject to the existing trust of $7,700,000.00 (the former bondholder security). The Court is also unsure as to the effect on Ross's indebtedness of the $8.4 million sale by RBV to a third party. It seems possible that RBV could have received the entire proceeds. If the Court were to ignore these concerns, it is possible that Riggs would receive the entire $8.4 million from its subsidiary RBV and collect $8.3 million from Ross thereby receiving almost $17,000,000.00 on a debt that had an original principal balance not even half of that.

### 11 U.S.C. § 523(a)(2)(B)

Assuming for the moment there is an outstanding indebtedness, the Court moves on to § 523(a)(2)(B). Under the Bankruptcy Code, there is a presumption that debts are dischargeable. However, certain statutory exceptions have been carved out of this general rule and have been memorialized in 11 U.S.C. § 523. In a suit to determine the dischargeability of a debt, the plaintiff has the burden of proof and must, by the preponderance of the evidence, prove that the debtor's particular obligation fits under one of the statutory exceptions promulgated in § 523. *Grogan v. Garner*, 498 U.S. 279, 289, 289, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Under 11 U.S.C. § 523(a)(2)(B) [6], the elements are in the conjunctive thus putting the burden on the plaintiff to prove them all. *In re Sandler*, 143 B.R. 67, 69 (Bankr.E.D.Va.1992). The Court discusses each of the elements below.

### Writing

Unlike 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B) requires that the false state-

ment be in writing and must be written, signed or be adopted by the debtor. *See Engler v. Van Steinburg*, 744 F.2d 1060, 1060–61 (4th Cir.1984) and Collier on Bankruptcy § 523.09[1]. Here, each of the suspect documents, the 1985 statement and Gecker's letter, was in writing. The fact that they were not signed by the debtor is not determinative as Ross would have this Court hold. *Engler* allows a financial statement to be adopted by the debtor. It was shown at trial that Ross directed Gecker to write the letter to Riggs, supplied much of the information for it, and reviewed it. The joint stipulations in pertinent part state:

> Ross provided Gecker with information for purposes of preparing the Gecker Letter and reviewed the Gecker Letter prior to its submission to Riggs. Moreover, Ross authorized Gecker to communicate the substance of the Gecker letter to Riggs prior to April 21, 1986, and was aware on April 21, 1986, that Gecker had authored and delivered such letter to Riggs.

*Joint Stipulations*, ¶ 34 (Introduced at trial). In addition, the fact that Ross chose to update his 1985 statement proves that he was adopting those portions of the statement that had not changed and was seeking to update the portions that had.

### Materiality

This Court has defined a materially false statement as "one that 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'" *I.H. Mississippi Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 807 (Bankr.E.D.Va. 1993) (citations omitted).

Ross's omission of several million dollars in guaranties to Manufacturers Hanover

---

6. In pertinent part, 11 U.S.C. § 523(a)(2)(B) states:
   (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
   (B) use of a statement in writing—
   (i) that is materially false;
   (ii) respecting the debtor's or an insider's financial condition;
   (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
   (iv) that the debtor caused to be made or published with intent to deceive;

paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. A prudent creditor evaluating a guarantor's credit worthiness would look to the applicant's debt load and his net worth to evaluate whether the applicant could become burdened with more debt. These large guaranties, if called upon, had the potential to drive Ross's net worth deeply in the negative and to multiply several times the amount of his liabilities. Further, from the testimony of Riggs's officers involved in Plaza's loan, Ross's guaranty was an important part of the lending decision. Under direct examination by Riggs's attorney, Steven J. Hinterseher, an executive vice president with Riggs who was a member of the loan committee which approved the loan stated:

Q. Now, in approving it, did the committee rely on the information provided in the credit request [which included information on Ross's financial worth]?

A. It did.

. . . . .

Q. The real estate loan like this one was, why was it important to have information concerning the guarantor?

A. Well, generally you are looking for a primary and secondary source of repayment. Obviously primary source of repayment would be the underlying project. The secondary source of repayment would come from the guarantors. It's also important to be able to look at a transaction that in case it leases out more slowly than anticipated, slowly, whatever particular remember project does, the or sell more slowly, whatever the case may be as far as the particular real estate project, does the guarantors have the capacity to help support the project while the lease up was occurring or whatever the case may be.

*Trial Transcript,* pp. 64 & 65. In addition, a deposition, done through letter rogatory, of Margaret Nordlinger, a former employee of Riggs's and the loan officer in charge of Plaza's LoC application stated:

Q. Did Riggs determine that it would require personal guarantees from Mr. Ross and the other general partners of Plaza One Associates as a condition of the issuance of the Letter of Credit?

A. Yes.

*Deposition Upon Oral Examination of Mrs. Margaret Nordlinger,* p. 4 11.17–21 (Introduced into evidence as Plaintiff's Exhibit # 30). These statements illustrate the importance with which Riggs viewed Ross guaranty and necessarily the financial statements which supported it. Because of this, a material change in these statements would have affected Riggs's decision to grant the LoC. Consequently, Riggs meets its burden under § 523(a)(2)(B)(ii).

### Financial Condition

Under § 523(a)(2)(B), the suspect statements must be in writing and must respect the debtor's or insider's financial condition. *See Collier on Bankruptcy,* ¶ 523.09[3] (15th ed. 1994). Here, the 1985 statement and Gecker's letter do describe Ross's financial condition.

### Reasonable Reliance

■ The requirement that the creditor must reasonably rely on the furnished financial statements was recently analyzed in *Paterno Imports v. McBee (In re McBee)*, 167 B.R. 827 (Bankr.E.D.Va.1994) (Tice, J.) which stated:

A fundamental requirement of reliance under § 523(a)(2)(B) is that the creditor prove the debtor was under a duty to furnish a financial statement as part of the credit transaction. . . . Moreover the financial statement must have been asked for and furnished as a basis for credit, and the statement must have been a substantial consideration or a contributory cause for the creditor's accepting the transaction.

*Id.* at 830. There appears to be no question that Riggs did require Ross to submit his financial statements. Gecker's letter intimates that he was supplying an update of Ross's financial position per a request from

Margaret Nordlinger.[7] In addition, Nordlinger's deposition states that Riggs did request a personal financial statement from Ross as part of the LoC application process.[8] Evidence that Ross's personal financial statement was a substantial consideration in Riggs's decision to approve the LoC request is most evident in Steven J. Hinterseher's testimony and the LoC approval request documents. Hinterseher's testimony, reproduced above, states that a guarantor is very important to have in these request as a secondary source of repayment. The weight Riggs' put on Ross's guaranty is reflected in the credit request worksheet that the credit committee reviewed before making its decision. *Plaintiff's Exhibit, # 8* (Introduced at trial). On the second page of this document under the title of "Additional Support", is listed a profile of Ross's financial wellbeing based on the information supplied by the 1985 statement and Gecker's letter. This evidence, when collectively viewed, persuades the Court that Riggs reasonably relied on Ross's financial statements.

Ross argues that his financial statement was not reasonably relied upon because the presence of other guarantors, injections of cash by the partners, and the value of the underlying collateral made unnecessary the need for his guaranty. The Court is not persuaded by this argument. The desire to have multiple guaranties tends to show a need for and a reliance on them as added security as is borne out by the facts of this case. There is no effective evidence which convinces this Court that merely because the LoC was supported by other security, that Riggs did not substantially consider and rely upon Ross's financial statements in making their credit decision. *See In re Liming,* 797 F.2d 895, 897–98 (10th Cir.1986) (Court ruled that even though bank had collateral worth twice the amount of the loan, bank's reliance on debtor's personal financial statements was reasonable).

Through his post-trial brief, Ross also alleges that he had discussed the Manufacturers Hanover debt with a Mr. Pickeral, an officer for Riggs and that since Riggs was aware of at least some of Ross's Manufacturers Hanover debt, it could have easily found out about the unlisted guaranties. However, at trial, Ross did not testify as to any conversations with Mr. Pickeral and in his deposition, Ross could not decide whether he had a conversation with Mr. Pickeral about his financial obligations with Manufactures Hanover. *Plaintiffs Exhibit # 27,* pp. 105–08 (Introduced at trial). As to Riggs's supposed duty to investigate Ross's financial obligations to Manufacturers Hanover, the Court has already ruled that Riggs reasonably relied upon the financial statements. It will not allow Ross to escape liability by mandating that Riggs was under a duty to ferret out each of Ross's intentional misstatements.

### *Intent to Deceive*

In order to satisfy § 523(a)(2)(B)(iv), this Court has stated that: [T]he bank must prove that the debtor committed actual fraud, that he intended to defraud the bank by a false financial statement.... Constructive or implied fraud is insufficient to bar the discharge of the debt to the bank.... This Court requires the creditor to prove that the debtor published the statement with the intention and purpose of deceiving the creditor. *I.H. Mississippi Valley Credit Union v. O'Connor, (In re O'Connor),* 149 B.R. 802, 809 (Bankr.E.D.Va.1993) (citations omitted). Although the constructive or implied fraud does not satisfy the § 523(a)(2)(B)(iv) test,

---

7. Gecker's letter begins:
    As we discussed today, I am pleased to provide you with an update on George Ross' financial position.
    *Gecker's Letter,* p. 1 (Joint Stipulation Exhibit # 18).

8. Nordlinger's Deposition reads in pertinent part:
    Q. Did Riggs determine that it would require personal guarantees from Mr. Ross and the other general partners of Plaza One Associates as a condition of the issuance of the Letter of Credit?
    A. Yes.
    Q. In connection with Riggs' determination whether to extend credit to Plaza One Associates, did you request that George Ross submit personal financial statements to Riggs?
    A. Yes.
    *Nordlinger's Deposition,* p. 4 11.17–26 (Introduced as Plaintiff's Exhibit # 30).

**130**

fraud need not be expressly shown. Rather, it may be proven by persuasive circumstantial evidence. *See In re Claxton,* 30 B.R. 199, 212 (Bankr.E.D.Va.1983). In the instant case, there is sufficient evidence to prove that Ross deliberately understated his contingent liabilities in order to defraud Riggs and induce it to issue the LoC.

First, in his 1985 statement, Ross does not report his guaranty of the October 1983 Manufacturers Hanover debt. While the Court has no evidence as to the potential liability on this guaranty as of the date the 1985 statement was submitted to Riggs, the statement makes no mention of the Manufacturers Hanover guaranty and thus by that absence misstates Ross's financial condition.

The most persuasive evidence of Ross's fraudulent intent, however, is Gecker's letter. In his testimony, Gecker states that he wrote the letter using information supplied by Ross and also using information obtained by his own involvement in some of Ross's projects, including Plaza's. Gecker also stated that he was unsure as to whether Ross reviewed the letter before it was sent out. The Court finds that Gecker's ambiguous testimony as to who gave what information for his letter irrelevant. Ross was responsible for giving all relevant financial information to Gecker so he could accurately draft the letter to Riggs. It is highly unlikely that Ross simply forgot about a guaranty on which he had just agreed to increase his liability to over $7,700,000.00 the month before. Making the letter even more misleading is the fact that it mentions a $600,000.00 contingent liability to Key Bank but makes no mention to Manufacturers Hanover's mammoth contingent liability. The question as to whether Ross reviewed Gecker's letter before it was sent to Riggs is settled by the before mentioned joint stipulation. In addition, Ross's own testimony at trial was limited to his name, address, employment status, and net worth. If Ross had wished to assert that he did not review the letter or that it inaccurately recorded the information he supplied to Gecker, this was the time to do so.

In conclusion, the Court finds that Ross's outstanding indebtedness to Riggs should be considered nondischargeable after deducting therefrom such credits received by Riggs as a result of the liquidation of the asset, by it or its subsidiary RBV, which were properly credited to the balance due under the guaranty by Ross. The Court chooses to allow the parties to work together to find the correct amount of Ross's outstanding indebtedness.

The parties are directed to submit an order in conformity with this opinion within thirty days.