In re Mary Kay **COLVIN**, Debtor.

**FIRST BANK, Plaintiff,**

v.

**Mary Kay COLVIN, Defendant.**

**Bankruptcy No. 89–03320–DPM.
Adv. No. 89–0329(2).**

United States Bankruptcy Court,
E.D. Missouri, E.D.

Aug. 2, 1990.

Donald Gunn, Jr., St. Louis, Mo., for plaintiff.

Andrew Sandroni, St. Louis, Mo., for defendant.

Charles W. Riske, Clayton, Mo., Trustee.

James S. Cole, St. Louis, Mo., Asst. U.S. Trustee.

## MEMORANDUM OPINION

DAVID P. McDONALD, Chief Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(I), which the Court may hear and determine.

### INTRODUCTION

The Debtor, Mary Kay Colvin, filed her Chapter 7 case on August 9, 1989. On November 13, 1989 First Bank filed this adversary complaint seeking to deny the debtor a discharge of a particular debt in the amount of $3,603.47, pursuant to 11 U.S.C. § 523. The complaint was tried to completion on June 5, 1990.

### FACTUAL BACKGROUND

The Debtor has been employed for approximately thirteen years as a Customer Business Representative with Union Electric Company ("UE") in St. Louis, Missouri. Ms. Colvin's duties consist of answering customer telephone inquiries. In May 1988, she failed to appear at work for several days. When her employer called to inquire why she was not at work, Ms. Colvin explained that she was waiting for a call from the President of The United States who was going to present her with a Nobel Prize for her work in Africa. UE representatives encouraged her to attend a meeting with them immediately and urged her not to go anywhere. They met, conferred and Ms. Colvin agreed to enter the Lutheran Hospital for psychiatric evaluation. She was seen by Dr. Buntee Co, Jr., a board certified psychiatrist, who diagnosed her as suffering from manic depressive bipolar disorder—manic type. Initially, she was given lithium carbonate until it was discovered that she was pregnant. Thereafter, she was removed from all medication, but remained in the hospital from May 18 to July 1, 1988. When she was released from the hospital, Colvin was in remission. Because this was her first episode, Dr. Co decided not to resume her medication, but simply required her to see him on a regular basis. Unfortunately, Ms. Colvin believed she was cured and saw the doctor only once more, on July 11, 1988.

On March 30, 1989, Ms. Colvin experienced a relapse as she sat at her work station. When her supervisor asked her why she was not answering customer calls, Colvin explained she was waiting for Mr.

Dill, president of UE, to announce her promotion to vice president. UE then sent her home and she did not return to work until May 1, 1989.

On March 31, 1989, the day following her second episode, Ms. Colvin visited the Plaza Motor's showroom where she purchased a new 1989 Mercedes Benz, 560 SL Coupe for $65,920.00, less down payment by a trade-in allowance of $8,000.00 on her 1983 Mercury Cougar. In order to borrow the balance of nearly $58,000.00, she completed a standard financial statement wherein she stated she was a vice president of UE with an annual gross income of $100,000.00. Plaza Motor Company faxed the financial statement and security agreement to Plaintiff, First Bank. Two hours after Ms. Colvin walked in to Plaza Motor and stated that she wanted to buy the little red car, First Bank approved the loan and Plaza Motor assigned the executed Note and Security Agreement to First Bank.

Raymond L. Spies, President of the Consumer Lending Department at First Bank, testified that when the bank received Ms. Colvin's financial statement they reviewed the statement and ran a credit check. The credit report revealed she was a member of Electro Credit Union which indicated that she was an employee of UE. Her credit rating was very good and the report did not reveal anything inconsistent with her financial statement. He further explained that his bank annually purchases approximately one million dollars of car loans from Plaza Motor. Since Plaza sells only luxury cars, (i.e. Merecedes–Benz, BMW, Cadillac, Porsche, Infiniti, Rolls–Royce and Range Rover), it is not unusual for a customer's financial statement to indicate that the individual is a vice president of a major corporation with an annual income of $100,-000.00.

Spies also testified that it is standard practice in the industry to approve or reject a loan within a few hours, because most customers want to drive away in a new car immediately. Since the lenders want the motor company's business, the banks try to complete the loan as quickly as possible. In the instant case, First Bank relied on the information contained in the financial statement and the credit report. They assumed, but did not verify, that the financial statement was accurate and truthful and that Colvin was in fact a vice president earning an annual gross income of $100,000.00. When dealing with corporate officers, doctors and lawyers, Spies said, it is impossible to verify income in less than a couple weeks. A lender simply cannot call a clerk in a personnel department and ask what the vice president is earning. Therefore, when dealing with individuals with high positions and large incomes, the bank accepts as truthful the assertions made in the financial statement. First Bank also relied on Plaza Motor to present a financial statement that Plaza felt was accurate. When nothing appears in the credit report that contradicts the financial statement, the bank does not pursue its investigation. It only conducts an analysis to determine whether the borrower's income is sufficient to service current obligations and the car payments. This calculation is accomplished by deducting from the gross income an allowance of 20% for taxes and any other major monthly payments. If 25% to 30% of the individual's gross income remains after making these deductions, the bank considers this net balance a sufficient reserve to meet the car payments. Based on the debtor's financial statement, she qualified for the loan with monthly payments in excess of $1,300.00. Of course, Spies said the bank relied on the fact that the financing statement revealed an income of $100,-000.00. If the bank had known that her actual salary was $40,000.00, she would not have qualified for a loan of almost $58,-000.00.

The Debtor testified that she submitted a financial statement which indicated that she was a vice president of UE with an annual income of $100,000.00 because at the time she actually believed it was true. Dr. Co explained that such beliefs are totally consistent with her mental disorder of manic depressive bipolar disorder-manic type. Individuals suffering from this disorder experience grandiose delusions, euphoria, intense feelings and extreme irritability. Their judgment is poor and they

tend to seek pleasurable activities that often lead to financial and personal problems.

After she purchased the Mercedes, Colvin sensed that she was becoming ill and her employer urged her to see her doctor. Dr. Co saw her on April 8, 1989, and the following four Wednesdays. He treated her as an outpatient, prescribed lithium carbonate and carefully monitored the dosage of this medication. Ms. Colvin responded well to the treatment.

In the mean time, she tried to return the car to Plaza Motor. A salesman suggested she advertise the car and try to sell it herself. When she was unable to sell the car, Colvin contacted First Bank and made arrangements to return the car to Mr. Spies. The Debtor took possession of the Mercedes on March 31, 1989 and eventually returned the car on May 10, 1989 with an odometer reading of approximately 1300 miles. Spies explained that she would probably owe a deficiency on the car of $3,000.00 to $5,000.00 and said that the bank would be willing to set up a monthly payment program for her to pay the deficiency.

First Bank sold the car for $54,500.00 to Plaza Motor, which had submitted the highest of three bids. As a result of this sale First Bank seeks a deficiency of $3,603.47, plus attorney fees of $540.52 and interest of $527.00 for a total of $4,670.99.

DISCUSSION AND ANALYSIS

■ The Plaintiff contends that the debt owed by the Debtor to the Plaintiff should be found nondischargeable pursuant to Section 523(a)(2)(B) of the Bankruptcy Code which provides as follows:

(a) A discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual from any debt—
* * * * * *
(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—
* * * * * *
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an individual's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; .... 11 U.S.C. § 523.

A creditor must prove all of the elements set out above in order to prevail. *In re Bundy*, 95 B.R. 1004, 1008 (Bankr.W.D.Mo. 1989). It is clear that the Debtor obtained financing for the automobile through the publication of a materially false financing statement. While the facts surrounding the reasonableness of First Bank's reliance on the information contained in the financing statement are less clear, the Court assumes without deciding that such reliance was indeed reasonable.

The final element of § 523(a)(2)(B) is determinative. In order to prove that the Debtor acted with the requisite intent, the Plaintiff must offer evidence that the Debtor knew or should have known of the falsity of the statement when made. *In re Perez*, 94 B.R. 765, 768 (Bankr.M.D.Fla. 1988). Intent also may be inferred from evidence which reveals a reckless disregard for the truth or falsity of the statement made. *See, e.g., In re Martin*, 761 F.2d 1163, 1167 (6th Cir.1985). Once the Plaintiff presents evidence from which an intent to deceive may be inferred, the burden of proof shifts to the Debtor/Defendant who then may offer testimony to vitiate that inference. *Matter of Hutchinson*, 27 B.R. 247, 252 (Bankr.E.D.N.Y.1983).

The Plaintiff asserts that the circumstances present in this case indicate that the Debtor knew she would not receive financing without publishing a false statement regarding her financial condition and income. In addition, Plaintiff contends that an intent to deceive can be inferred from the material misrepresentations contained in the financing statement submitted to Plaintiff through Plaza Motor Company. In response, the Debtor presented the testimony of Dr. Buntee Co, Jr., M.D., in support of her contention that her diminished mental capacity precluded her from forming the requisite intent to deceive her credi-

**488**

tors. The Court finds the uncontroverted testimony of Dr. Co to be entirely credible. The Plaintiff offers no evidence tending to refute Debtor/Defendant's affirmative defense of diminished mental capacity. Accordingly, the Court finds that the Plaintiff has failed to establish that the Debtor submitted the financing statement with the intent to deceive. Therefore, the Plaintiff's petition to determine the dischargeability of the debt owed it by Debtor/Defendant must be DENIED.

■ The Plaintiff offers an alternative theory of relief under Missouri law. Plaintiff correctly notes that a contract entered into by one with diminished mental capacity is subject to rescission under Missouri law. As a consequence, Plaintiff contends that it is entitled to be returned to the position it enjoyed prior to the agreement with the Debtor/Defendant. While its claim for a return to the status quo is well grounded in state law, the Plaintiff holds only an unsecured claim subject to discharge in this Chapter 7 proceeding. 11 U.S.C. § 727(b).

■ The Debtor/Defendant requests that it be awarded attorney's fees in the amount of $500.00. Where a creditor has requested a determination of dischargeability of a consumer debt under § 523(a)(2) and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fees for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust. 11 U.S.C. § 523(d). The test of whether a challenge is substantially justified is essentially one of reasonableness. *See,* S.Rep. No. 98–65, 98th Cong., 1st Sess. 58, 59 (1983). The Plaintiff made out a prima facie case, but the Court has found that the case was successfully rebutted by the Debtor/Defendant because she lacked the requisite intent due to her diminished mental capacity. These special circumstances preclude the award of fees and attorney's fees. Accordingly, the Debtor/Defendant's petition for an award of attorney's fees must be DENIED.

An Order consistent with this Memorandum Opinion shall be entered this date.