In re Douglas **MAGNUSSON**, f/d/b/a JDI Chevron, Debtor.

**WATERBURY COMMUNITY FEDERAL CREDIT UNION, Plaintiff,**

v.

**Douglas MAGNUSSON, f/d/b/a JDI Chevron and Stephen D. Gerling, Trustee, Defendant.**

**Bankruptcy No. 80 01792. A.D. No. 81 0091.**

United States Bankruptcy Court, N. D. New York.

Oct. 1, 1981.

spouse is required to make payments.

Mark A. Wolber, Utica, N.Y., for plaintiff.

James M. Kernan, Oriskany, N.Y., for debtor.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

LEON J. MARKETOS, Bankruptcy Judge.

On November 19, 1980, Douglas Magnusson, f/d/b/a JDI Chevron (hereinafter, the Debtor) filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. 101, et seq. (hereinafter, the Code). That petition was subsequently converted to a Chapter 7 proceeding. On April 23, 1981, the Waterbury Community Federal Credit Union (hereinafter, the Credit Union) filed a complaint pursuant to Rule 701(7) of Bankruptcy Procedure thereby commencing an adversary proceeding to determine the dischargeability of a debt owing to the Credit Union from the Debtor.

Basically, the Credit Union's Complaint alleges that (1) it extends credit, i. e., loans to its "customers"; (2) the extension of credit is dependent upon financial status information provided by customers to the Credit Union at the time application for credit is made; (3) on May 6, 1979 the Debtor submitted a written signed application to the Credit Union for a loan, in the sum of $1,000.00; (4) the Credit Union granted the loan to the Debtor; (5) the Credit Union, in extending such credit to the Debtor, relied upon the submitted application which contained materially false information on the Debtor's financial condition; (6) such application was made with an intent to deceive and defraud the Credit Union; (7) the debt enumerated, having been fraudulently obtained, is nondischargeable under the provisions of the Bankruptcy Code. The Credit Union alleges its claim to be in the amount of approximately $1,229.53.

The Debtor's answer denies all the Complaint's substantive allegations but for the fact that on May 7, 1979, the Credit Union did lend the Debtor the sum of $1,000.00 and is a creditor of the Debtor. The prayer for relief seeks a determination that the debt is dischargeable and dismissal of the complaint.

## FINDINGS OF FACT

Mrs. Dolores Copperwheat, an assistant treasurer of the Credit Union, Mr. Eric Miller, a loan approval officer for the Credit Union, Richard Copperwheat, the Credit Union's manager-treasurer; and the Debtor

presented testimony to the Court. The Court makes these findings:

1. The Credit Union is open to the entire local community. The acquisition of a loan is possible once an individual becomes a member of the Credit Union. Membership is a mere formality.

2. On May 6, 1979, the Debtor met with Mrs. Copperwheat at her home out of which the Credit Union is operated. The membership application took little time. The Debtor then filled an "APPLICATION FOR LOAN" (Ex. 1) (hereinafter, the Application) consisting of a single 8 × 5 inch card. Mr. Copperwheat testified that the terms of the Application are to be read as: a loan for one thousand dollars ($1,000.00); for twenty-four months; installments monthly of $48.78. The card's front portion, inconspicuously, states "I hereby certify that all statements made, including those on the reverse side hereof, are true and complete and submitted for the purpose of obtaining credit. I have no other debts." The Debtor signed the card on the front.

3. On the reverse side of the card there is a one-half portion which states:

APPLICANT'S STATEMENT

"I WARRANT AND REPRESENT AS AN INDUCEMENT TO GRANTING THE LOAN IN THE SUM OF $_____ THAT THE FOLLOWING IS A TRUE AND CORRECT LIST OF ALL MY OBLIGATIONS."

| CREDITOR | ADDRESS | AMT. OWING |
|---|---|---|
| Oneida National * | | $ 3500.00 * |
| Sears * | | $ 430.00 * |
| Wards * | | $ 275.00 * |

Only three lines provide space for names of creditors and amounts after dollar symbols. The Debtor signed the signature line provided. He also indicated on appropriate lines that: his employer, as of April 11, 1978, was Revere Copper & Brass, Rome, N.Y.; his weekly salary was $260.—; and "AUTO OWNED" was Chevy '74. (* Debtor's longhand entry).

4. Mrs. Copperwheat testified that she helped the Debtor start the Application but he completely filled in the "Applicant's Statement" side on his single visit, in her presence. No conversation was had between Mrs. Copperwheat and the Debtor concerning the "Applicant's Statement" portion of the Application. Without specific recollection to this Application, Mrs. Copperwheat testified that she tells all loan applicants that "all debts be listed" and that the Applicant must fill in this portion of the application including his length of employment and salary. Mrs. Copperwheat also testified that she and the Debtor never spoke concerning any of his debts as he filled out the Application. Mrs. Copperwheat did not mention to the Debtor the ability to add additional sheets to list his debts. The Application was completed in 20–30 minutes.

5. On May 7, 1979, the Debtor returned to Mrs. Copperwheat's home to sign a promissory note and Truth-in-Lending Disclosure Statement (Ex. 2). Mrs. Copperwheat duly witnessed the Debtor's signing and receipt of copies of those documents. Mrs. Copperwheat issued a Credit Union check (No. 3148) dated May 7, 1979, signed by Richard Copperwheat for the sum of one thousand dollars ($1,000.00). This check was endorsed by the Debtor and negotiated.

6. The Credit Union put the Debtor's bankruptcy petition and schedule of creditors into evidence (Ex. 4). Upon direct examination of the Debtor, it was clearly established that one of the fourteen listed obligations was *not listed* on the Credit Application *although* it was incurred and still outstanding as of May 6, 1979. It was an obligation between Revere Employees' Credit Union and the Debtor in the sum of $1,109.03. Debtor's further testimony stated that this "Revere" obligation pertained to a purchase money loan to buy the Debtor's "Chevy 74" car. This obligation was an initial loan of $1,500.00 which was being re-paid by automatic weekly deductions from the Debtor's paycheck.

7. Mr. Eric Miller is a loan officer of the Credit Union and his duties include running credit checks, reviewing loan applications, and approving such applications. Mr. Miller was the sole approving officer on this loan. He testified that: his approval rested upon the debts listed on the Application; he made no verification of the correctness of these debts or the existence of other debts

attributable to the Debtor; he accepted the Application on its face and relied entirely on the Application in granting his approval. Mr. Miller believed that the term "all debts" contained in the Application instructions, meant "all". Miller testified that had he known of the "Revere" debt for $1,000.00, he would not have approved the loan.

8. Mr. Miller further testified that the listed debts were the gauge by which he determined the Debtor's ability to pay. Upon looking at the debts, Miller felt that the Debtor's stated income was sufficient to meet monthly payments. Mr. Miller did inquire of Mrs. Copperwheat who personally verified that the Debtor "works at Revere". Upon cross-examination, Mr. Miller stated that knowledge of monthly payments owing on outstanding debts "would have been helpful" but, here, they were not requested. Mr. Miller stated that a gross monthly debt figure could then be compared to a gross monthly income figure. He further testified that in his approval he "checked creditors he (Debtor) owed money to—that didn't seem excessive" and Mr. Miller thought the Debtor made a good salary. Approval of the loan was made on May 6, 1979. After such approval the promissory note documents, supra, (Ex. 2) were typed.

9. The Debtor testified that he (1) read and understood that the Application requested him to list "all" his obligations; (2) listed the debts he knew at the time and as the Application "had room" to list; (3) that nobody informed the Debtor to list more than there was room provided. The Debtor also testified that he did not ask what to do if there were more outstanding debts than room allowed to list nor whether to differentiate between "minor" or "major" debts. The Debtor considered himself to have four major outstanding debts at the time he executed the Application.

10. The Debtor testified that he was led to believe he was to list only his "major" debts on the three "dollar sign" spaces provided on the Application. He listed his car, as requested, but, the Court notes, the Application did not inquire as to outstanding encumbrances on the "Auto". He listed a gross, not net, weekly salary amount.

11. The Debtor denied omission of the "Revere" debt to make his Application reflect a better financial condition; "I listed all my major debtors (sic) that I knew at the time..." The Debtor testified that a sketchy discussion was had concerning the "Revere" debt with Mrs. Copperwheat, but she denies that fact.

12. The Debtor, knowing of the automatic deduction to his paycheck for the "Revere" debt explained that he listed his creditors vis-a-vis what money he had left after receiving his paycheck although he did not list his salary figure as a "net" amount. The Debtor's testimony was given in a credible and sincere manner.

13. The Debtor was involuntarily laid off by Revere, his employer, in May, 1980.

14. The Credit Union's employees work on a voluntary noncompensated basis.

15. Mr. Copperwheat testified that the Credit Union did receive some payments from the Debtor. The initial monthly payment of June 7, 1979 was received on June 8th, in full, for $48.78. No payments were received until December 10, 1979 when $112.24 was received. Thenceforth, no subsequent payments were ever received on this loan.

16. Notices of late payment owing, contacts to an attorney and a collection agency were subsequently instituted to receive payment on the Debtor's loan.

17. The proof of damages at trial is inconsistent with the Credit Union's pleadings. After the December 10, 1979 payment, there remained a principal balance of $946.31 and interest accruing on the unpaid balance at 1% per month (Ex. 2). Mr. Copperwheat testified that interest was 9.46% per month, therefore, I conclude the unpaid balance excludes unpaid accruing interest. Eleven months transpired between the last payment and the November 19, 1980 filing of a Chapter 13 petition by the Debtor. Principal and accruing interest at the petition date would be (1) principal balance

($946.31) plus interest (11 × 9.46 = $104.06) approximately, totalling $1050.37. There are no damages for reasonable attorney fees or collection agency fees. Mr. Copperwheat testified that the agency fee was contingent upon recovery and that the attorney has submitted no bill to date.

## DISCUSSION

██ The Credit Union seeks to except its debt as listed in the Debtor's schedules from discharge. Exceptions to discharge are to be narrowly construed. *In re Sidney J. Paley*, 8 B.R. 466, 468, 3 C.B.C.2d 648 (Bkrtcy.E.D.N.Y.1981). Moreover, the burden of proving that a debt comes within one of the statutory exceptions is upon the party opposing the discharge of the debt. *Id.* Lastly, the existing case law construing § 17(a)(2) of the repealed Bankruptcy Act of 1898 is entirely applicable and should be followed in the resolution of dischargeability questions arising under § 523(a)(2) of the 1978 Bankruptcy Code which concerns debts for obtaining money, property, service, or an extension or renewal of credit by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debtor's financial condition that is materially false, on which the creditor reasonably relied and which the debtor made or published with intent to deceive. See, *In re Calvin Brent Jones*, 3 B.R. 410, 412, 6 B.C.D. 68, 69 (Bkrtcy.W.D.Va.1980); H.R. Rep. No. 595, 95th Cong., 1st Sess. 363 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 78 (1978), U.S.Code Cong. & Admin.News 1978 p. 5787; see also, *In re Bobby J. Miller*, 5 B.R. 424, 427, 2 C.B.C.2d 849, 853 (Bkrtcy. W.D.La.1980) (re: § 523(a)(2)(A)).

██ The thrust of the Credit Union's complaint and proof at trial concerns the written "APPLICATION FOR LOAN" (Ex. 1) and its representations. In the absence of express allegations, the Court discerns that the Credit Union seeks a determination of nondischargeability on the debt in issue based on § 523(a)(2)(B) of the Code which provides in pertinent part, as follows:

(a) A discharge under Section 727...does not discharge an individual debtor from any debt—

\*　　\*　　\*　　\*　　\*　　\*

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

\*　　\*　　\*　　\*　　\*　　\*

(b) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. 523(a)(2)(B). The Credit Union has the burden of proving each element of its claim under this section. Proof of each element must be by clear and convincing evidence. *In re Brian K. Callery*, 6 B.R. 527, 529 (Bkrtcy.S.D.N.Y.1980) see also, *In re Thomas Allen Smith*, 2 B.R. 276, 278, 5 B.C.D. 1265, 1266 (Bkrtcy.E.D.Va.1980); *In re Paul L. Barrett*, 2 B.R. 296, 298 (Bkrtcy. E.D.Pa.1980) (re: Bankruptcy Act of 1898, § 17(a)(2)). *Contra, In re Baiata*, 12 B.R. 813, Bankr.L.Rep. (CCH) Decisions, ¶ 68,264 (Bkrtcy.E.D.N.Y.1981) and cases cited therein. "Where dishonesty or fraud, is at issue, the courts have typically required a higher standard of proof." *In re Brian K. Callery*, supra, 6 B.R. at 529 quoting *In re Robert Charles Huff*, 1 B.R. 354, 357, 1 C.B.C.2d 171, 173 (Bkrtcy.D.Utah 1979).

### A.

The loan Application in issue was utilized by the Credit Union and resulted in the Debtor obtaining money from the Credit Union. Clearly, this Application, as filled out by the Debtor, qualifies as a statement in writing respecting the Debtor's financial condition. See, 11 U.S.C. 523(a)(2)(B)(ii).

The next element of requisite proof is a showing that this Application is "materially false". At trial, the Credit Union established that a debt for approximately $1,100.00 to "Revere" was incurred, undisputed, and outstanding on and before the

Debtor's completion of the Application. This debt was omitted from the listing of debts. The debts listed were: $3,500.00; $430.00; and $275.00; totalling $4,205.00.

Under § 17(a)(2) of the repealed Bankruptcy Act there, too, was a "materially false" statutory requirement to the false financial statement exception to discharge in bankruptcy. See, 11 U.S.C. 523(a)(2)(B)(i). The "materially false" component of proof was closely scrutinized in the case of In re William Tomeo, 1 B.R. 673 (Bkrtcy.E.D.Pa.1979). This Court agrees with the Tomeo court that in "the 'materially false' requirement, the statutory language should be taken to mean a 'substantial or important untruth'." 1 B.R. at 676. The $1,100.00 "Revere" debt constitutes an increase of approximately 25% to the Debtor's listed liabilities. This omitted amount is found to be substantial besides transforming the Application to an untruthful representation of the Debtor's financial condition. The Credit Union has satisfied the "materially false" element of proof.

### B.

Under § 523(a)(2)(B)(iii) of the Code, the Credit Union must also prove that it has "reasonably relied" on the Debtor's Application. Even partial reliance on a false financial statement (Application) is sufficient to render a debt nondischargeable. See, In re Baiata, supra; In re Thomas Allen Smith, supra, 2 B.R. at 279, 5 B.C.D. at 1267; In re Daniel Evans Sewell, 361 F.Supp. 516, 518 (S.D.Ga.1973). Yet, the partial reliance doctrine may not be seized upon to fill a gap caused by unreasonable reliance. In re Thomas Allen Smith, supra, 2 B.R. at 279, 5 B.C.D. at 1267 (Emphasis added). Basically, a debtor may give a materially false financial statement in writing, know it is false, and intend out-and-out to deceive, yet if the creditor did not rely upon the statement, the debt is still discharged. Id., 2 B.R. at 277, 5 B.C.D. at 1266.

Mr. Miller's testimony established that there was, in fact, complete reliance on the Application for approval of the loan. The crucial factual determination is the reasonableness of Mr. Miller's reliance on such Application as an accurate and complete representation of the Debtor's financial condition. Simply phrased, the question is, whether faced with the knowledge the creditor had, was reliance on the given statement reasonable. See, Matter of William Smith Redford, 7 B.R. 322, 324 (Bkrtcy.N.D. Ga.1980); In re Lane, 10 B.R. 701, Bankr.L. Rep. (CCH) Decisions, ¶ 67,980 (Bkrtcy.N.D. Ohio 1981).

Mr. Miller reviewed the listed liabilities and assessed that they were not "excessive" vis-a-vis the Debtor's stated salary. Mr. Miller stated that he sought to ascertain the Debtor's "ability to pay". I find the Application is woefully incomplete to assist in making an "ability to pay" determination. The Application fails to inquire into (1) monthly installment payments on the listed obligations; and (2) outstanding encumbrances on the assets that may be listed (e. g., mere ownership of "Auto" listing). I find that even a complete and accurate answering of this Application would not render an accurate picture of financial condition in either an (1) asset net worth or (2) income/net cash flow evaluation. On its face, this Application is inherently unreliable due to the lack of sufficient solicited information to portray an applicant's financial condition. See, In re Adams, 368 F.Supp. 80, 82–3 (D.S.D.1973); Matter of Henry Danesi, 6 B.R. 738, 740 (S.D.N.Y. 1980), aff'g 1 B.R. 234 (Bkrtcy.S.D.N.Y. 1979).

In a situation where a creditor asserts complete reliance on a debtor's completion of a "form" statement of financial condition, the statement, to engender reasonable reliance, must be of such a character that it portrays a net asset worth or net income figure. Under an objective standard[1] of

---

1. An objective standard by which to measure "reasonableness" requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters a responsible and careful use of solicited financial statements and

"reasonable reliance" I find that the Credit Union fails to meet its burden of proof on that element.

## C.

Assuming arguendo that reasonable reliance was shown, the last element of requisite proof for the Credit Union is clear and convincing evidence of the Debtor's "intent to deceive" when executing his Application. See, 11 U.S.C. 523(a)(2)(B)(iv). Obtaining credit by a materially false financial statement will prevent bankruptcy discharge if the bankrupt-debtor either (1) had actual knowledge of the falsity of the statement, or (2) demonstrated reckless indifference to the accuracy of the facts stated therein. *Matter of Bardwell*, 610 F.2d 228, 229 (5th Cir. 1980); in accord, *In re Paul L. Barrett*, 2 B.R. 296, 298 (Bkrtcy.E.D.Pa. 1980) (re: Bankruptcy Act of 1898, § 17(a)(2)). Where a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to make a loan, intent to deceive may logically be inferred. *Carini v. Matera*, 592 F.2d 378 (7th Cir. 1979) citing to *In re Nelson*, 561 F.2d 1342, 1346–47 (9th Cir. 1977). This inference arises because where a debtor knowingly makes a false statement, he must be held to have intended the natural and necessary consequences of his act. *In re Arnold Jay Norton, Jr.*, 11 B.R. 141, 145 (Bkrtcy.D.Vt.1980) citing to *In re Stine*, 60 F.Supp. 703 (E.D. Mo.1945). A finding of an "intent to deceive" is a finding of fact relating to a subjective state of mind wherein the bankrupt's credibility is an important factor. See, *In re Nelson*, supra, at 1347; in accord, *In re William K. McGrath*, 7 B.R. 496, 498 (S.D.N.Y.1980).

Although a creditor must carry the burden of persuasion on all elements of proof, once the creditor has made a *prima facie* showing that the debtor (1) made a

materially false representation in writing, and (2) that the creditor relied upon such representation to its detriment, the burden of production, *viz.*, the burden of going forward with evidence to show that the debtor had no intent to deceive the creditor, shifts to the debtor. *In re William Tomeo*, supra, 1 B.R. at 677–78 and cases cited therein. What happens mechanically, then, is this: Once the creditor has made its *prima facie* case, a presumption arises that the debtor made the representations with "intent to deceive". At that point, the burden of going forward with evidence to the contrary (not the burden of persuasion) shifts to the debtor. *Id.* The effect of the presumption in a (Bankruptcy Act) § 17(a)(2) case causes the debtor to be charged with a duty to come forward with some evidence that he had no intention of deceiving the creditor. *Id.* The mere introduction of evidence rebutting the presumed fact causes the presumption to disappear from the case. *Id.* citing to Hecht and Pinzler, *Rebutting Presumptions: Order Out of Chaos*, 58 B.U.L.Rev. 527–33 (1978).

## D.

The Credit Union's proof seeks to show an intentionally deceptive omission of the "Revere" debt. Admittedly, the Credit Union's Application for Loan, in "boiler plate" fashion, requests all obligations to be listed. Notwithstanding such formidable language at the top of the Application, it has been observed that it is questionable whether any court today will give sacrosanct status to such boiler plate language such as "I have no other debts." See, *In re Thomas Allen Smith*, supra, 2 B.R. at 280.

The Debtor has testified to his reasons for omitting the "Revere" debt. Such testimony rebuts the presumption of intent to deceive. The evidence in this case irrefutably establishes that the Credit Union did not suggest nor supply additional space

discourages the "spurious use" of such statements which are obtained primarily with a view to the exception to discharge if the debtor defaults and declares bankruptcy. See, H.R. Rep. No. 595, 95th Cong., 1st Sess. 130 (1977).

*But cf. Matter of Garman*, 643 F.2d 1252, 1255–56 n.6 (7th Cir. 1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981) (re: § 17a(2) of Bankruptcy Act of 1898).

for an exhaustive or "true and correct listing of all (his) obligations." (Ex. 1). Absent clearly termed instructions, I find that to supply a debtor with only a few lines to list his outstanding liabilities does not lead that debtor to reasonably believe that he is requested to provide anything more than a representative sampling or just a few "major" debts.[2] The limited space to list debts naturally mitigates against the printed request to make an exhaustive listing.[3] In contrast, a debtor, as a loan applicant, who is confronted with instructions to use additional space for "all" debts should know that examination of available sources, i. e., a debtor's personal records, would be necessary to correctly comply with the application's requested listing of obligations. See, e. g. *In re Paul L. Barrett*, supra, 2 B.R. at 301.

A debtor's reasonable belief of what financial information is requested is directly related to his "knowing" or intentional omission of debts. I find this Debtor's omission was not done in a "knowing" manner. Rather, the reasonable belief of the Debtor expressed in my tenth and twelfth factual findings illustrates that he made an honest mistake as to the scope of obligations sought by the Credit Union's Application. The evidence, in its entirety, does not persuade this Court that the Debtor intentionally deceived the Credit Union when executing the Application. Therefore, it cannot be inferred nor concluded that the Debtor knowingly made a false Application.

In summation, on the issue of "intent to deceive", the Credit Union's evidence is not clear and convincing. The Debtor has presented testimony which is collaborated by the Application that (1) rebuts the presumption of intent to deceive, and (2) de-

stroys the logical inferences that might follow from the Credit Union's showing of a *prima facie* case. Thus, the Credit Union has failed to carry the burden of proof as to the existence of any specific and actual intent to deceive on the part of the Debtor.

### CONCLUSIONS OF LAW

The Credit Union has failed to meet its burden of proof on all elements of § 523(a)(2)(B) under the Bankruptcy Code. It is, therefore,

ORDERED, ADJUDGED AND DECREED that the debt of the Debtor to the Credit Union as evidenced by the loan of May 7, 1979, is dischargeable and the complaint is dismissed.

---

**2.** In the case of *Sun Finance & Loan Company v. Cononico*, 177 N.E.2d 84 (Mun.Ct. Ravenna Co. 1959) Judge France made these poignant observations:

> Until small loan companies are realistic in furnishing sufficient space for the listing of existing debts by their hard pressed customers, courts ... can scarcely be blamed for viewing with suspicion the claim that such a postage stamp size paper is expected to pro-

duce an exhaustive list of indebtedness. 177 N.E.2d at 86.

**3.** Other bankruptcy courts have considered the scope of liabilities inquired into or the number of lines to list outstanding obligations as relevant to an "intent to deceive" determination. See, *Ohio Grain Company v. Gentis*, 10 B.R. 209, 210–11 (Bkrtcy.S.D.Ohio W.D.1981); *Matter of William Henry Dyer*, 3 Bankr.Ct.Dec. 180, 182 (Bankr.Ct.W.D.Wisc.1978).