**In re Joseph SCARPINITO, Debtor.**

**STATEN ISLAND SAVINGS BANK, as successor in interest by merger to Gateway State Bank, a New York State Banking Institution, Plaintiff,**

v.

**Joseph SCARPINITO, Defendant.**

**Bankruptcy No. 193–10478–353.**
**Adv. No. 193–1287–353.**

United States Bankruptcy Court,
E.D. New York.

June 3, 1996.

Deutsch and Frey, L.L.P. by Herbert I. Deutsch, Geron & Corsano, L.L.P. by Yann Geron, New York City, for Plaintiff.

Camhy, Karlinsky & Stein, L.L.P. by John F. Triggs, New York City, Substituted Counsel for Defendant.

## DECISION ON EXCEPTION TO DIS-CHARGEABILITY AND REVO-CATION OF DISCHARGE

JEROME FELLER, Bankruptcy Judge.

Before the court is a bitterly contested adversary proceeding between implacable foes of long standing, a bumbling bank and a cunningly devious entrepreneur, Joseph Scarpinito. At the core of this dispute is a $1.4 million loan by the plaintiff, Gateway State Bank, to Mr. Scarpinito under what may be viewed in hindsight as ominous circumstances.[1] Mr. Scarpinito, after first obtaining an extension of its due date, defaulted on the loan less than two years after its procurement. The Bank, in addition to other legal action taken against Mr. Scarpinito, sued in New York state court and ultimately obtained a substantial judgment. Subsequent to entry of the judgment, Mr. Scarpinito commenced his Chapter 7 case.

Unrelenting, the Bank commenced this adversary proceeding with the filing of a com-plaint dated June 22, 1993, which, after a number of amendments and in its final form, sets forth three causes of action. The first seeks to have the aforementioned judgment declared non-dischargeable pursuant to two separate statutory provisions, 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). The second and third causes of action seek revocation of the Mr. Scarpinito's discharge pursuant to 11 U.S.C. § 727(d).

The matter having come on for trial, and after consideration of the amended pleadings, joint pre-trial memorandum, trial testimony, documentary evidence, credibility of witnesses and both parties' proposed findings of fact and conclusions of law and respective responses thereto, the court finds that in making the loan, the Bank relied on financial statements submitted by Mr. Scarpinito, including his personal financial statement and a forged financial statement of one of his companies, which omitted millions in contingent liabilities and painted a materially false financial picture. Accordingly, the judgment is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The Bank did not sustain its burden of proof regarding its 11 U.S.C. § 523(a)(2)(A) assertions of nondischargeability. The Bank also failed to sustain its burden of proof regarding its third cause of action based on § 727(d), and we therefore decline to revoke Scarpinito's discharge.

This decision constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.

### I.

On or about April 28, 1989, the Bank loaned Mr. Scarpinito ("Scarpinito" or "Defendant"), and his company Scarpi Realty Corp. ("Scarpi"), $1.4 million (the "Loan"). The Loan proceeds were used by Scarpinito to fund his purchase of "The Renaissance", a real estate development located in Rancho Mirage, California. Scarpinito purchased The Renaissance in the name of Townley Rancho Mirage Associates, L.P. ("TRM"), a California limited partnership and, along

---

1. Staten Island Savings Bank, referenced as plaintiff in the caption of this adversary proceeding, is the successor in interest by merger to Gateway State Bank, effective on or about August 18, 1995. Hereinafter, plaintiff will be referred to simply as the "Bank".

with Scarpi, executed a note for and guaranteed the Loan.[2] In connection with the Loan application, Scarpinito furnished the bank with his personal financial statement and the financial statements of several of his companies. Such companies included, of course, Scarpi, as well as Scarber Supply Corp. ("Scarber") and H. Beroza, Inc. ("Beroza").

During the course of processing the Loan application, the Bank examined the financial statements, performed title searches of relevant properties and interviewed Scarpinito. With a net equity of close to $9 million, Scarpinito, at least on paper, appeared financially sound. However, after granting the application but prior to closing on the Loan, the Bank became aware of problems with the financial statements. The nature and extent of these problems is the subject of much controversy and will be discussed more fully below. Nevertheless, the Bank ultimately concluded Scarpinito's financial condition was sufficiently sturdy and the Loan was closed.

In or about April of 1990, after a year of broken promises and spotty payments, Scarpinito requested an extension of the Loan's due date and release of certain collateral held by the Bank. To that end, Scarpinito and his cohorts made certain oral and written representations to the Bank.[3] On or about June 19, 1990, the Bank resignedly acceded to Scarpinito's request.

In or about February, 1991, Scarpinito defaulted on the Loan. Shortly thereafter, the Bank commenced an action for the outstanding amount due in the New York State Supreme Court. On October 23, 1991, the New York State Supreme Court entered a judgment in favor of the Bank against Scarpinito in the sum of $1,102,316.14, which judgment has become final and is outstanding ("New York state court judgment"). In December 1992, the Bank also instituted a major civil action against Mr. Scarpinito and others in California Superior Court ("California action"), which is predicated on numerous frauds he and others allegedly perpetrated in connection with The Renaissance real estate development project.

On January 20, 1993, Scarpinito filed in this court a petition for relief under Chapter 7 of the Bankruptcy Code.[4] By complaint dated June 22, 1993, the Bank timely commenced this adversary proceeding seeking, among other things, to have the New York state court judgment declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). Specifically, the Bank contends the Loan upon which this judgment is predicated was obtained by Scarpinito via materially false financial statements, including one which was forged, and upon which the Bank reasonably relied. In the same cause of action, the Bank contends Scarpinito obtained an extension of the Loan's due date and release of unspecified collateral by means of various other material misrepresentations and omissions.

A discharge was granted Scarpinito on July 15, 1993, subject to the outcome of this adversary proceeding. The Bank subsequently amended its complaint to add second and third causes of action for revocation of Scarpinito's discharge, both pursuant to 11 U.S.C. § 727(d) and both failing to identify the specific subsection of this provision upon which they are based.[5] The second cause of action, based exclusively on Scarpinito's al-

2. Scarpinito owned 24 limited partnership units in TRM and also owned a two-thirds (⅔) interest in TRM's general partner, Townley Construction Corporation ("TCC"). Shiraz Sanjana ("Sanjana"), Scarpinito's business associate and former employee, owned the remaining one-third (⅓) of TCC. Sanjana's interest in TCC was funded by a loan of $33,333.33 from Scarpinito, repayment of which remains in question.

3. These "cohorts" included Sanjana as well as William Brown, Scarpinito's cousin and part owner of TRM.

4. Earlier, on December 9, 1992, TRM filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York. Venue of the TRM Chapter 11 case was transferred to this court. A plan was never confirmed and the TRM Chapter 11 case was ultimately dismissed.

5. The Bank amended its complaint a second time (Second Amended Complaint, dated June 2, 1995), adding factual allegations claimed to have been obtained through discovery, but no new causes of action. The Second Amended Complaint is the operative pleading in this case and will hereinafter be referred to as the "Complaint".

leged failure to list certain creditors, was inexplicably withdrawn at the beginning of trial. The third and sole remaining cause of action seeks revocation of Scarpinito's discharge based on his failure to disclose on his bankruptcy petition and schedule certain assets. We will first examine the Bank's claims under § 523 and then its remaining cause of action under § 727.

## II

 While a fundamental objective of bankruptcy law is to provide a fresh start for an honest but unfortunate debtor, this policy is tempered by the equally important principal of preventing the use of the law by a dishonest debtor to shield his or her wrongdoing. *First Am. Bank of N.Y. v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 27 (Bankr.E.D.N.Y.1994) (quoting *National Bank of N. Am. v. Newmark (In re Newmark)*, 20 B.R. 842, 852 (Bankr.E.D.N.Y. 1982)). The Bankruptcy Code, therefore, provides for a general policy of discharge of a debtor's indebtedness, *see* 11 U.S.C. § 727, but limits the opportunity for a completely unencumbered new beginning by excepting from discharge certain categories of debts, *see* 11 U.S.C. § 523(a), full repayment of which Congress has determined outweighs a debtor's interest in a complete fresh start. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991).

 Excepting a debt from discharge can significantly affect a debtor's ability to make a fresh start and accordingly, all such exceptions are to be strictly construed in favor of the debtor and against the creditor, who also bears the burden of proof. *See In re Bodenstein*, 168 B.R. at 27; *Hudson Valley Water Resources, Inc. v. Boice (In re Boice)*, 149 B.R. 40, 43 (Bankr.S.D.N.Y.1992); *Horowitz Fin. Corp. v. Hall (In re Hall)*, 109 B.R. 149, 153 (Bankr.W.D.Pa.1990); *Schwal-*

*be. v. Gans (In re Gans)*, 75 B.R. 474, 481 (Bankr.S.D.N.Y.1987). However, such exceptions "are to be construed in favor of the debtor only 'so far as reasonable.'" *In re Gans*, 75 B.R. at 482 (quoting *In re Soika*, 365 F.Supp. 555, 556 (W.D.N.Y.1973)). Thus, the quantum of evidence necessary to sustain a statutory exception to discharge is a less exacting preponderance of the evidence. *Grogan*, 498 U.S. at 286–87, 111 S.Ct. at 659–60 (holding the fresh start policy of the Bankruptcy Code does not require the application of a more rigorous clear and convincing evidentiary standard). Further, where a plaintiff presents evidence sufficient to prove the non-dischargeability of the debt in question, the burden thereafter shifts to the debtor to provide evidence to refute plaintiff's prima facie case. *See Bodenstein*, 168 B.R. at 28; *Southwest Fin. Bank & Trust Co. v. Stratton (In re Stratton)*, 140 B.R. 720, 724–25 (Bankr.N.D.Ill.1992); *First Bank v. Colvin (In re Colvin)*, 117 B.R. 484, 487 (Bankr. E.D.Mo.1990); *In re Gans*, 75 B.R. at 482.

 In its first cause of action, the Bank seeks to have its New York state court judgment against Scarpinito declared non-dischargeable pursuant to both 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B).[6] Unfortunately, the clear distinction between these two statutory provisions has eluded the Bank throughout the entire course of this adversary proceeding. Section 523(a)(2)(A) excepts from discharge certain debts to the extent obtained by false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or insider's financial condition*. Statements respecting a debtor's or an insider's financial condition are actionable only under § 523(a)(2)(B), and only if such statements are written and otherwise satisfy the requirements of that provision. *See Eugene Parks Law Corp. v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1457 (9th Cir.1992);

---

**6.** 11 U.S.C. § 523(a)(2) provides in pertinent part, that a debtor will not be discharged from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by
 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
 (B) use of a statement in writing—

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive....

*Seepes v. Schwartz (In re Schwartz)*, 45 B.R. 354, 356–57 (S.D.N.Y.1985); *Chemical Bank v. Sigrist (In re Sigrist)*, 163 B.R. 940, 947 n. 9 (Bankr.W.D.N.Y.1994). These provisions are mutually exclusive. *See* 3 *Collier on Bankruptcy* ¶ 523.08 at 43 (Lawrence P. King, ed., 15th ed. 1995).

That the Bank fails to comprehend these established legal principles is evident from its complaint, which contains in one cause of action a myriad of allegations regarding misrepresentations made by Scarpinito in procuring first the Loan and then an extension of its due date. These include written misrepresentations respecting Scarpinito's financial condition and that of his companies in connection with the initial granting of the Loan, as well as various other written and oral misrepresentations. Further, in support of its confused allegations, the Bank hurls mountains of disjointed, often times, inscrutable facts and law in the apparent hope that the massiveness of its submissions will overcome the absence of any over-arching litigation strategy. In toto, from its first complaint to last post-trial submission, the presentation of the Bank's case is fuzzy.

To our dismay, the Defendant does little to focus matters. No evidence of his own by way of a direct case in rebuttal is presented. No attempt to explain or justify his highly questionable conduct is made. Instead, Scarpinito invokes his fifth amendment privilege against self incrimination and simply asserts that the Bank has failed to carry its burden of proving it relied on his misrepresentations. In the main, the vehicle employed to implement this strategy is cantankerous cross-examination of the Bank's witnesses, particularly the Bank's president.

Thus, to this court falls the daunting task of determining whether there exists, in the river of facts introduced at trial, facts sufficient to except the New York state court judgment from discharge. Obviously, separate determinations must be made with respect to section 523(a)(2)(A) and (a)(2)(B) dischargeability exceptions. For reasons which will soon be readily apparent, we begin with § 523(a)(2)(B).

## A. *Section 523(a)(2)(B)*

■ For the New York state court judgment to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B), the Bank must demonstrate by a preponderance of the evidence that Scarpinito induced the granting of the Loan by use of a statement in writing: i) that was materially false; ii) respecting Scarpinito's or an insider's financial condition; iii) on which the Bank reasonably relied; that iv) Scarpinito caused to be made or published with intent to deceive.

It is undisputed that Scarpinito's personal financial statement, which was submitted to the Bank in support of the Loan application, reported assets of approximately $11 million and liabilities of only $2.2 million. *Joint Pre-Trial Mem.*, Uncontested Facts ¶ 5. The Bank alleges that this statement failed to list Scarpinito's personal guarantee of the debts of his companies, which amounted to over $7 million in contingent liabilities. (*Compl.* ¶ 18). These omitted contingent liabilities include Scarpinito's personal guarantee of Scarber's $2 million indebtedness to Citibank, as well as his personal guarantee of Scarpi's indebtedness of several million dollars to various financial institutions and individuals. *Id.*[7] In addition, the Bank alleges that Scarber's financial statement and an accompanying accountant's report were forged, and that the Beroza financial statement omitted debts to Morton Beroza of over $600,000.00. (*Compl.* ¶¶ 17, 19).

Clearly, Scarpinito's personal financial statement, as well as those of Scarber, Scarpi and Beroza, are written statements respecting the financial condition of the debtor and insiders, thus falling within the reach of § 523(a)(2)(B).[8] Further, as Scarpinito's

---

7. These obligations include: 1) Scarpi's obligations to Central Federal Savings of $700,-000.00 and $1.2 million; 2) Scarpi's various obligations to Mountain Ridge State Bank, totaling at least $600,000.00; and 3) Scarpi's various obligations to Max Hoffman and Laura Anacreonte, totaling at least $700,000.00.

8. Scarber, Scarpi and Beroza are "insiders" of Scarpinito. The Bankruptcy Code defines an insider of an individual debtor to include a corporation of which the debtor is a director, officer, or person in control. *See* 11 U.S.C. § 101(31)(A)(iv).

personal financial statement reflected a net equity of $8.8 million, the omission of significant contingent liabilities (i.e, over $7 million or approximately 80% of his reported net equity) would render that financial statement materially false. *See In re Bebar,* 315 F.Supp. 841, 845 (E.D.N.Y.1970); *Riggs Nat'l Bank v. Ross (In re Ross),* 180 B.R. 121, 124 (Bankr.E.D.Va.1994). Remarkably, Scarpinito has specifically acknowledged the absence from his personal financial statement his personal guarantee of a $2 million line of credit extended to Scarber by Citibank. *See Def.'s Proposed Findings of Fact and Conclusions of Law* at 4. Scarpinito has also failed to controvert the Bank's evidence of several million dollars in additional contingent liabilities arising from various other personal guarantees, including those set forth in its complaint, which were also absent from his personal financial statement and from the other financial statements submitted in connection with the Loan application. *Pl's Ex.* 2, 19–21. Instead, Scarpinito's defense begins and ends with an attack on the Bank's assertions of reliance.

■ Section 523(a)(2)(B)(iii) specifies that a creditor must establish two elements. Not only must the creditor establish actual reliance upon the false financial statement, but also that its reliance was reasonable. *See In re Bodenstein,* 168 B.R. at 30 (citing *Texas Am. Bank v. Barron (In re Barron),* 126 B.R. 255, 259 (Bankr.E.D.Tex.1991)); *In re Boice,* 149 B.R. at 46 (same). We first address the simpler issue of Bank's actual reliance on the financial statements.

To prove actual reliance the Bank need not show that Scarpinito's personal financial statement and those of his companies were the sole reason for extending credit, partial reliance is sufficient. *See Ark. Aluminum Alloys v. Joyner (In re Joyner),* 132 B.R. 436, 441 (D.Kan.1991) (citing *In re Myers,* 124 B.R. 735, 742 (Bankr.S.D.Ohio 1991)); *Lincoln First Bank v. Tomei (In re Tomei),* 24 B.R. 204, 206 (W.D.N.Y.1982); *Federal Deposit Ins. Corp. v. Reisman (In re Reisman),* 149 B.R. 31, 38–39 (Bankr.S.D.N.Y. 1993). To show partial reliance, the Bank need only demonstrate that the false financial statements were a substantial factor in causing it to grant the Loan. *In re Tomei,* 24 B.R. at 206; *In re Reisman,* 149 B.R. at 38–39; *In re Hall,* 109 B.R. at 154.

Merton Corn, the Bank's President and officer primarily responsible for the decision to grant the Loan, testified that Scarpinito produced his personal financial statement and those of his companies at their initial meeting. *Trial Tr. (August 17, 1995)* at 43–44. A contemporaneous inter-office memorandum prepared by Mr. Corn reflects his reliance upon these submissions to the Bank. *Pl.'s Ex. 23.* The memorandum indicates that Scarpinito's positive equity position left Mr. Corn favorably disposed towards granting the Loan. *Id.; Trial Tr. (August 17, 1995)* at 44–46. Mr. Corn further testified that the absence of personal guarantees from these financial statements, particularly Scarpinito's personal financial statement, impacted favorably on this assessment. *Trial Tr. (August 17, 1995)* at 52–53. Accordingly, while the Bank reviewed credit reports, performed title searches and obtained appraisals on relevant properties, actual, albeit partial reliance, on the financial statements in granting the Loan is clear.

Less clear, however, is the reasonableness of the Bank's reliance. To that end, Scarpinito readily admits to or fails to controvert evidence of numerous misstatements, discrepancies, omissions and untruths regarding the financial statements, some of which the Bank was supposedly aware prior to closing on the Loan. Scarpinito contends, without defending his actions in any way, that the Bank's awareness of his duplicities precludes a finding of reasonable reliance upon his financial statements. Upon closer examination, however, we find that the facts and circumstances of which the Bank was aware in no way hinted at the true state of Scarpinito's financial affairs, i.e., that the foundation of what appeared on paper to be a solid financial structure had rotted and was about to crumble. Accordingly, we find the Banks reliance on the financial statements was reasonable. We explain.

■ Reasonable reliance within the context of § 523(a)(2)(B) is not defined by the Bankruptcy Code. However, the standard for determining whether reliance is rea-

sonable is an objective one. *In re Hall,* 109 B.R. at 154. As reiterated by this court

[R]easonableness requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters responsible and careful use of solicited financial statements and discourages the 'spurious use' of such statements....

*In re Newmark,* 20 B.R. at 862 (quoting *Waterbury Community Fed. Credit Union v. Magnusson (In re Magnusson),* 14 B.R. 662, 668–69 n. 1 (Bankr.N.D.N.Y.1981)).

Scarpinito makes much of the fact that the Bank became aware of certain problems with the financial statements prior to closing on the Loan. The Scarpi financial statement failed to list unencumbered real estate worth $500,000.00, and understated a mortgage to Citibank by $500,000.00. *Def.'s Proposed Findings of Fact and Conclusions of Law* at 4. The Scarber financial statement, which indicated a $2 million line of credit with Citibank, failed to disclose a general security interest in inventory and accounts receivable in favor of Citibank in that amount. *Id.* Further, the Bank's appraisals indicated that collectively, the financial statements overstated the value of various parcels of real estate by several million dollars. *Id.* How then, Scarpinito asks, could anyone reasonably rely on financial statements containing such errors?

The answer is clear. The Bank loaned Scarpinito $1.4 million, which he personally guaranteed. Scarpinito's personal financial statement (and the financial statements of his companies) made no reference to *any other personal guarantees or contingent liabilities.* To the extent the financial statements of his companies understated certain obligations or overstated or omitted certain assets, the effect on Scarpinito's personal economic situation was, at most, ambiguous.[9] Nothing the Bank learned about Scarpinito's overall financial posture altered the fundamental perception that it remained well protected, particularly in light of his reported net worth of close to $9 million.

Now, Scarpinito does contend that the Bank was aware of at least one significant personal guarantee—to wit, his personal guarantee of Scarber's $2 million indebtedness to Citibank. *Id.* Indeed, awareness of this undisclosed contingent liability prior to closing on the Loan may well render unreasonable the Bank's reliance on Scarpinito's personal financial statement for the propositions that there existed no contingent liabilities and that he was, at least personally, financially sound. Had the Bank been aware of this significant contingent liability, it should have made greater efforts towards further verification or investigation. Failure to do so under such circumstances would constitute a hallmark of unreasonableness. *See In re Boice,* 149 B.R. at 47; *Mun. Credit Union v. Brown (In re Brown),* 55 B.R. 999, 1003 (Bankr.E.D.N.Y.1986); *Ky. Bank & Trust Co. v. Duncan (In re Duncan),* 35 B.R. 323, 325 (Bankr.W.D.Ky.1983). Remaining true to form, however, Scarpinito presents no direct evidence in support of this factual assertion, choosing instead to "prove" it by way of a blistering, if ultimately unavailing, attack on the veracity of the Bank's witness. We elaborate.

In response to questions presented on cross examination, Mr. Corn explicitly stated that prior to closing on the Loan, the Bank was unaware of *any* personal guarantee by Scarpinito for the debts of his companies. *Trial Tr. (August 17, 1995)* at 93. Mr. Corn was then confronted with prior deposition testimony in which, when asked if the Bank was aware of Scarpinito's guarantee of the Scarber indebtedness to Citibank, he answered in the affirmative. *Id.* at 96–99. Thus "impeached", Scarpinito would have it that the Bank's entire case is undermined. We disagree.

When confronted with his prior testimony Mr. Corn specifically stated that at the time, he thought he was being asked about the Bank's awareness of Scarber's obligations to Citibank and not about Scarpinito's personal guarantee of those obligations. *Id.* at 99. Given Scarpinito's potpourri of duplicity with

---

9. Mr. Corn specifically testified that Scarpinito had a good credit history and excellent references. *Trial Tr. (August 17, 1995)* at 62. He further testified that the overvaluation of real estate in a financial statement was not an uncommon occurrence. *Id.* at 60.

respect to Scarber alone, this error, while serious, is not unreasonable.[10] It should be remembered that not only did Scarpinito fail to disclose in his personal financial statement his personal guarantee of Scarber's $2 million indebtedness to Citibank, the Scarber financial statement itself omitted a concomitant $2 million general security interest in accounts receivable and inventory.[11] But this is just the tip of the iceberg. The entire Scarber financial statement and an accompanying accountant's report, both purportedly prepared by Thomas Dambro (C.P.A.), were forgeries. In fact, Mr. Dambro testified by affidavit that he prepared neither document and, although a former employee, hadn't had contact with Scarpinito in years. *Pl.'s Ex.* 5. These statements of Mr. Dambro are uncontradicted.

■■■ At this point, Scarpinito's chutzpa in attacking anyone's veracity should be readily apparent to even the most casual reader. Repeatedly questioned about his duplicity, including his submission of forged documents relating to Scarber's financial posture, Scarpinito invoked his constitutional privilege against self incrimination.[12] By way of contrast, Mr. Corn provided this court with forthright testimony under uncomfortable circumstances and, while his business judgment has been repeatedly questioned throughout the course of this adversary proceeding, his honesty has not. In sum, we find him to be a credible witness and accept his testimony that the Bank was unaware of Scarpinito's contingent liabilities. Accordingly, we find the Bank's reliance reasonable.

We close this portion of our discussion by addressing the lone remaining element of the Bank's § 523(a)(2)(B) claim, intent to deceive pursuant to subparagraph (iv). In doing so, we will not clutter this decision with unnecessary legal analysis or case citations. We

state only this: if anyone ever intended deceit, it is Joseph Scarpinito.

### B. *11 U.S.C. § 523(a)(2)(A)*

■■■ Based on the preceding, it would appear superfluous to analyze the Bank's allegations with respect to § 523(a)(2)(A) and we do so briefly, if only to highlight a fundamental deficiency in the Bank's case under this provision. For the New York state court judgment to be excepted from discharge pursuant to § 523(a)(2)(A), the Bank must establish by a preponderance of the evidence that in obtaining the Loan, Scarpinito: (1) made the alleged misrepresentations; (2) knowing they were false; (3) with the intention of deceiving the Bank; (4) who relied on the misrepresentations; and (5) sustained the alleged loss as a result. *See In re Boice,* 149 B.R. at 44; *In re Gans,* 75 B.R. at 482–83; *Minority Equity Capital Corp. v. Weinstein (In re Weinstein),* 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983).

The Bank makes numerous allegations which would appear to be encompassed by this provision, all of which pertain to Scarpinito's effort to obtain an extension of the Loan's due date and the release by the Bank of certain unspecified collateral ("Extension Agreement"). It is undisputed that in April of 1990, with the Loan's due date fast approaching and no way to pay, Scarpinito contacted the Bank with the intention of entering into the Extension Agreement. *Joint Pre–Trial Mem., Uncontested Facts* ¶ 13. To that end, Scarpinito, through his cohorts, Sanjana and Brown, represented that 11 of the 30 Renaissance lots were sold at prices between $350,000.00 and $375,000.00, that TRM had obtained additional monies from Mechanic's National Bank via a construction loan, and that distribution to principals of sale proceeds would begin by year end. *Id.* ¶¶ 14, 15. The Bank contends

---

10. It should be noted that Mr. Corn's testimony that the Bank was unaware of Scarpinito's contingent liability to Citibank is consistent with his response to Defendant's First Set of Interrogatories to Plaintiff, executed December 19, 1994. *Pl.'s Ex.* 87.

11. It is of this later omission that the Bank acknowledges it had knowledge prior to closing the Loan.

12. We are permitted to, and in fact do, draw adverse inferences from Scarpinito's failure to testify in response to probative evidence offered against him. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976).

that Sanjana and Brown further represented that the Bank would receive $100,000.00 of the sales price of each unit sold and that Scarpinito failed to disclose certain material facts, the most significant being the existence of additional millions in contingent liabilities incurred subsequent to obtaining the Loan. (*Compl.* ¶¶ 26, 27). Needless to say, the truth of these statements is highly questionable.

We do not address whether Scarpinito can be charged with making these representations, whether they were false, whether they were made with intent to deceive the Bank, or even whether the Bank sustained a loss as a result. We consider only the element of actual reliance on the misrepresentations, which the Bank has failed to establish.[13]

Mr. Corn admitted unequivocally, in response to questioning on cross-examination, that the reason the Bank entered into the Extension Agreement was because that appeared to be the best way to liquidate the Loan under the circumstances. *Trial Tr. (September 7, 1995)* at 54. This statement is in accordance with the evidence. By the time it was approached by Scarpinito regarding the Extension Agreement, the Bank was fully aware of Scarpinito's duplicities. Further, and as he candidly admits, by this time Scarpinito had kept none of his promises to the Bank. *Def.'s Proposed Findings of Fact and Conclusions of Law* at 5.

We find the Bank did not rely on Scarpinito's representations in extending the Loan, as Scarpinito had by this time demonstrated to the Bank a track record of untrustworthiness and lack of credibility. Instead, having already granted the Loan, albeit in hindsight mistakenly, the Bank determined that it had no realistic alternative but to accede to the Extension Agreement in the hope of any possible further recoupment and not in reliance on the representations of Scarpinito or his agents. Accordingly, the Bank's claims under § 523(a)(2)(A) must fail.

## III.

The Bank's third and sole remaining cause of action seeks revocation of Scarpinito's discharge, granted by this court on July 15, 1993, based on Scarpinito's alleged failure to disclose on his bankruptcy petition and schedules certain assets. The statutory predicate for this claim is 11 U.S.C. § 727(d). For the reasons set forth below, this cause of action too must fail.

The Bank makes essentially two categories of allegations with respect to this cause of action. The first pertain to Scarpinito's purported sale to Sanjana of his interests in TRM and TCC. It is undisputed that in February of 1991, Scarpinito purported to convey to Sanjana his interest in TCC and his 24 limited partnership shares in TRM for consideration of $75,000.00 and $90,000.00, respectively ("Transfer"). *Joint Pre–Trial Mem., Uncontested Facts* ¶ 17. In spite of this sale, the Bank charges that Scarpinito continued to exercise effective control over, loan money to, and guarantee the debts of these entities, thus retaining an interest in TRM and TCC which was not disclosed in his bankruptcy petition and schedules. (*Compl.* ¶¶ 19, 45, 46).[14] In addition, the Bank makes numerous allegations respecting various loans by Scarpinito to financial institutions and individuals, including Sanjana and TRM. (*Compl.* ¶¶ 20–22, 47–52). These loans are alleged to have never been repaid and therefore constitute assets of Scarpinito which were likewise never listed on his bankruptcy petition and schedules. (*Compl.* ¶¶ 24–26, 54).

While the Bank fails to specify the applicable subsection of § 727(d), these allegations obviously pertain to § 727(d)(1).[15]

---

**13.** *The recent controversy over the level of reliance on fraud necessary to prevail under § 523(a)(2)(A) has been settled by the Supreme Court in* Field v. Mans, *which stated that any reliance must be "justifiable".* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

**14.** This Transfer is also the subject of the California action, a civil action commenced by the Bank in California Superior Court and mentioned earlier, seeking its avoidance as fraudulent as well as various other relief. *Joint Pre–Trial Mem., Uncontested Facts* ¶ 20.

**15.** Section 727(d)(1) provides, in pertinent part, that on the request of a creditor, and after notice and a hearing, the court shall revoke a discharge if such discharge was obtained through the fraud of the debtor, and the requesting party did not

For Scarpinito's discharge to be revoked pursuant to 11 U.S.C. § 727(d)(1), the Bank must establish that: (1) the discharge was obtained by fraud in fact; (2) it was unaware of the fraud prior to the granting of the discharge; and (3) the fraud, if known, would have resulted in the denial of a discharge under 11 U.S.C. § 727(a). *Elmira Sav. Bank v. George (In re George)*, 179 B.R. 17, 22 (Bankr.W.D.N.Y.1995); *Citibank v. Emery (In re Emery)*, 170 B.R. 777, 782–83 (Bankr.E.D.N.Y.1994).

██ The Bank has the burden of proving all of the elements contained in the statute, including its lack of knowledge of the fraud prior to the discharge being granted. *West Suburban Bank v. Arianoutsos (In re Arianoutsos)*, 116 B.R. 116, 118 (Bankr.N.D.Ill. 1990); *In re Kirschner*, 46 B.R. 583, 586 (Bankr.E.D.N.Y.1985). We discuss as a threshold issue the matter of the Bank's knowledge prior to July 15, 1993, the date a discharge was granted Scarpinito. However, we need not reach the issue of whether the Bank has adequately demonstrated its lack of knowledge because, for reasons undisclosed to this Court, it failed to submit at trial any evidence on this issue whatsoever.

In a desperate attempt to rectify this fatal omission, the Bank, in its post-trial submissions, refers to docket entries reflecting numerous discovery requests made by the Bank during the course of this adversary proceeding, the purported goal of which was to obtain facts and documentation relating its claims pursuant to § 727(d)(1). *Pl.'s Post Trial Findings of Fact and Conclusions of Law* ¶ 66. The Bank requests that this court takes judicial notice of these discovery requests which, it argues, Scarpinito and others thwarted time and again, necessitating motions to compel. *Id.* ¶ 67. From this, the Bank argues this court should infer that the Bank was unaware of the facts prior to Scarpinito's discharge that form the basis of its § 727(d)(1) claims. This we cannot do.

██ Our perogative to take judicial notice of documents contained in this court's file and dockets is irrelevant in the present context. While a bankruptcy judge may take judicial notice of a bankruptcy court's records, *see* Fed.R.Evid. 201(c), made applicable hereto by Fed.R.Bankr.P. 9017; *Wilson v. Huffman (In re Missionary Baptist Found., Inc.)*, 712 F.2d 206, 211 (5th Cir.1983); *Florida Bd. of Trustees v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir.1975), we may not infer the truth of facts contained in documents, unfettered by rules of evidence or logic, simply because such documents were filed with the court. *See* Barry Russell, *Bankruptcy Evidence Manual* § 201.5 at 201 (West 1995).

The inference proposed by the Bank may be reasonable in the abstract but is not the sole rational inference which may be deduced from the facts presented. In theory, the discovery requests may indicate an unawareness by the Bank of the facts ultimately uncovered. However, they may also evidence suspicions or even actual knowledge of these facts, of which the Bank sought confirmation or admissible evidence through discovery. Either way, the Bank had the burden of proving its asserted lack of knowledge prior to Scarpinito's discharge. It produced nothing conclusive. On the other hand, Scarpinito was able to show that the Bank was aware of at least some of the facts forming the basis of its § 727(d)(1) claims prior to discharge as a result of the California action. This evidence has not been rebutted by the Bank at all. Dismissal of a § 727(d)(1) revocation action is proper where, before discharge, the creditor knows facts such that it is put on notice of possible fraud. *Mid–Tech Consulting, Inc. v. Swendra*, 938 F.2d 885, 888 (8th Cir.1991). Having been put on notice of possible fraudulent conduct in the context of the California action, the burden was on the Bank to investigate diligently such possibly fraudulent conduct prior to discharge. The Bank submitted no proof regarding what investigation, if any, it conducted prior Scarpinito's discharge on July 15, 1993.

Accordingly, we do not reach the issue of whether the Bank has proven its substantive § 727(d)(1) allegations or, if proven, whether the showing would be sufficient to revoke Scarpinito's discharge. We find simply that

know of such fraud until after the granting of such discharge. 11 U.S.C. § 727(d)(1).

the Bank failed to offer any probative proof on an essential element of its claim and therefore, will not revoke Scarpinito's discharge.

### IV.

In conclusion, this court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J). We find the Bank has established by a preponderance of the evidence that Scarpinito's debt to it, based on the New York state court judgment in the amount of $1,102,316.14, is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The Bank has failed to demonstrate sufficient basis for excepting the New York state court judgment from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). We also find the Bank has failed to show sufficient basis for revoking Scarpinito's discharge pursuant to 11 U.S.C. § 727(d)(1), which discharge shall, except as hereinabove set forth remain in full force and effect.

**AN ORDER CONSISTENT WITH THIS DECISION SHALL BE ENTERED SIMULTANEOUSLY HEREWITH.**